(No. 39540.—

The People of the State of Illinois, Appellee, *vs.* George Willie Hobbs, Appellant.

*Opinion filed September 23, 1966.*

Lloyd F. Latendresse, of Decatur, for appellant.

William G. Clark, Attorney General, of Springfield, and Basil G. Greanias, State's Attorney, of Decatur, (Fred G. Leach, Assistant Attorney General, of counsel,) for the People.

Mr. CHIEF JUSTICE KLINGBIEL delivered the opinion of the Court:

The defendant, George Willie Hobbs, was convicted of murder on a jury verdict in the circuit court of Sangamon County. The verdict did not provide for the death penalty and the court sentenced him to the penitentiary for a term of 25 to 50 years.

In the early hours of November 21, 1964, on a secluded lane a short distance southwest of Decatur, Bertha Mae Scott was shot and killed. Defendant admits firing the shots but contends he did so in self-defense. On the day previous he had started drinking about 4:00 o'clock in the afternoon in anticipation of a weekend visit from his friend, Ronnie Worth, his wife and son. On the arrival of the Worths about 11:00 P.M., dinner was served by defendant's wife and all parties continued to drink beer and whiskey until about 2:00 A.M. when defendant and Worth left to find some "women". They stopped first at the house of an acquaintance of defendant's, and though she was unwilling to accompany them she was willing to accommodate defendant in her apartment, and did so, having intercourse with defendant while Worth waited outside in the car for about 45 minutes. On the way to a tavern they then met a friend of defendant's who offered the services of his girl friend for $7, the girl friend being Bertha Scott, the decedent. Worth expressed an interest in this proposition, the money was paid and the tryst took place in the back seat of the car behind the Pow Wow Club while defendant continued his drinking inside. From this point on there is a variance in the testimony of defendant and his friend, Worth.

Worth testified that after he had intercourse with Bertha in the back seat, he went to sleep and that when he awoke, about 3:30 or 4:00, the car was moving, defendant was driving and Bertha was in the front seat; that they stopped on a lonely lane and that from the conversation between

defendant and Bertha it was apparent they already had had intercourse and were now arguing whether her fee should be paid before or after a proposed second time; that defendant asked her out of the car and the next thing Worth heard was a shot; that looking out the back window he saw defendant shooting Bertha; that as he got out of the car defendant was still shooting and Bertha was on the ground; that he did not see a knife in Bertha's hand or on the ground; that defendant dragged her body into a depression off the lane, picked up the empty cartridge cases, went through her purse, took her money and, on the way home, threw her purse, rings, watch and the cartridge cases into the river and some of her clothing into a gulley.

Defendant's story is that he had started the previous day with $300, and that when he came out of the Pow Wow Club he had $195 left and carried it in his coat pocket; that at this time Worth and Bertha were still engaged in sexual relationships in the back seat and defendant suggested they should go somewhere else as the police might come along; that he drove, and his friend and Bertha remained in the back seat; that when he arrived at the country lane he kept the motor running and the heater on, got hot, took his coat off, threw it over the back of the front seat, bent over the steering wheel and fell asleep; that when he awoke at about 6:50 A.M., the motor had been turned off, Bertha and Worth were still in the back seat, both asleep, and his $195 was gone; that he awakened them, they denied having his money, he looked under the seat, got out, asked Bertha out, demanded to look into her purse, she refused; that finally she did open her purse, presumably to let him look, but instead she drew out a knife about 8 inches long; he retreated, she struck at him, he took out his pistol and shot her; that he must have panicked as he didn't recall what happened after the first three shots until he saw Worth standing by the car with Bertha on the ground about five feet from where he, the defendant, was standing; that the

purse and knife were on the ground beside her; that he examined the pocketbook and found his $195; that he and Worth picked up the exploded shell cases and at Worth's suggestion he took the jewelry and watch off Bertha and dragged her off the lane into a depression; that on the way home he threw the knife and purse in the river, put the gun in the glove compartment and Worth threw the watch and rings away; that when they arrived at defendant's house his wife made breakfast, Worth went to bed, and he related the night's events to his wife; she didn't believe him so they awakened Worth and on his confirmation defendant's wife went into hysterics; that the next day Worth and his family returned to Missouri and that night defendant and his wife drove to Lake Decatur and she threw the gun in the lake.

No one informed the police, but three days later the body was discovered by a hunter. Defendant was picked up and questioned because he was known to have been with decedent on the night in question. He gave police several different versions of his activities on that night, all of which differed substantially from his trial testimony.

Defendant contends that he was not proved guilty beyond a reasonable doubt; that the trial court erred in giving a particular instruction on motive and in denying one offered by him; that the admission of a photograph of decedent in evidence was prejudicial; that he was deprived of his constitutional right to trial by jury in that all persons expressing conscientious scruples against the death penalty were excluded from the jury.

Defendant argues that his self-defense story is much more believable than Worth's version of the affair; that a dispute with a prostitute over a $7 fee with $195 in his pocket is preposterous; that a more likely explanation of the events leading to the shooting is defendant's claim that decedent stole his money and that, on being confronted with discovery, she attacked; that the evidence of Worth that a desire for intercourse with Bertha led to the shooting when

defendant had been drinking for hours, had already had intercourse with one woman and possibly once before with Bertha, is unworthy of belief as it requires a conclusion contrary to human experience.

Defendant's version, if believed, might be considered as supporting his self-defense theory, but the credibility of the witnesses and the weight to be given their testimony are within the province of the jury, not the court. (*People* v. *Franklin*, 390 Ill. 108; *People* v. *Langer*, 384 Ill. 608.) The most that can be said is that the two versions constitute a conflict in the evidence, which fact does not of itself establish a reasonable doubt. (*People* v. *Kelly*, 8 Ill.2d 604.) Defendant's arguments as to sexual capacity and desire and the effect thereon of previous satisfaction and excessive drinking are highly speculative and not something upon which this court can rule as a matter of law. In addition, whether the argument originated over sex and price or over the money which decedent may have taken, the justification for the killing is a separate factor and we cannot say that the jury's determination thereof does not have substantial support in the record.

At the request of the State the court gave an instruction to the jury to the effect that the State is not required to prove a motive for the crime. Defendant requested and was refused an instruction to the effect "that should the evidence fail to show that the defendant had any motive this is a circumstance in favor of his innocence". Defendant argues that this was error in that failure to prove a motive other than the reason advanced by defendant would tend to support and lead to acceptance of defendant's version of the shooting, *i.e.*, that it was done in self-defense. This is tortuous reasoning. As stated above, whether the original argument started for one cause or the other there still remains the question whether the intentional shooting was or was not excusable on the grounds of self-defense. The fact that defendant believed decedent had taken his money is

not a circumstance in favor of his innocence. To so state, or imply, is to be argumentative and misleading. In effect, it predetermines an ultimate fact question which question is within the province of the jury alone. The shooting was admittedly intentional. Whether it was done in self-defense is to be determined not by what led up to the argument but whether decedent drew a knife putting defendant in fear of bodily harm sufficient to warrant his killing her. And in this theory the defendant had the benefit of and was fully protected under the instruction of the right of self-defense.

Where a deliberate criminal act is proved the State is not required to prove a motive for it, as motive is not an essential element of the crime of murder. (*People* v. *Mangano,* 375 Ill. 72.) And an instruction that is calculated to mislead the jury to understand that the law requires evidence of motive is properly refused. (*People* v. *Enright,* 256 Ill. 221.) Defendant cites cases from other jurisdictions holding that if an instruction is given that motive is not essential to be proved, the converse of such proposition must likewise be given, that failure to prove motive is a circumstance to be considered in defendant's favor. However, these cases and others we have examined appear to involve circumstantial evidence cases or cases where there is some doubt as to who committed the offense. It can be readily seen in such cases where failure to prove motive might have some bearing upon the guilt or innocence of the accused. Here, there is no doubt as to identity and such cases are not pertinent.

The photographs of which defendant complains are three pictures of the undisturbed body of decedent taken at the scene. Showing decedent lying on her back in tangled weeds and underbrush with her clothes in disarray, they do not appear to be spectacular or inflammatory such as to arouse the prejudicial emotions of the jury, and we find that the trial court did not abuse its discretion in admitting them in evidence.

Finally, defendant contends that he was deprived of his constitutionally guaranteed right of trial by jury in that 48 prospective jurors were excused for cause when in *voir dire* examination by the court they answered the following question affirmatively: "The crime of Murder is a capital offense. In such cases the jury may return a verdict of death. Where such verdict is returned by the jury, the Court may sentence the offender to death or to imprisonment. If in your deliberation as a juror you should find the defendant HOBBS guilty of the crime of murder—do you have any religious or conscientious conviction which would preclude you from returning a verdict of death?"

Before considering defendant's specific contentions we should like to discuss the right generally as it applies to an accused and to the State. In the first place it must be understood that it is a right to trial by an *impartial* jury, *i.e.,* one made up of persons prepared to exercise their personal judgment, favoring neither prosecution nor accused, standing indifferent to both, and guided only by law and the evidence in the performance of their duties. Based on this principle, it has been long established in this State that bias or prejudice, expressed or implied, and whether directed toward either party, constitutes ground for challenge for cause, and warrants disqualification, whenever such bias would control a juror's judgment or interfere with his duty to act impartially.

One of the most lucid and penetrating discussions of this principle is contained in the very early case of *Gates* v. *People,* 14 Ill. 433. There two jurors were challenged and excused for cause in a capital case involving the death penalty. Both expressed scruples against such penalty, one stating he would have to personally witness the murder before he would vote guilty, the other stating he would not agree to a guilty verdict unless he were starved into it. The court stated: "A juror ought to stand indifferent between the prosecution and the accused. He should be in a condi-

tion to find a verdict in accordance with the law and the evidence. On this principle, it is a good cause of challenge to a juror in a capital case, that he has conscientious scruples on the subject of punishment by death, that will prevent him from agreeing to a verdict of guilty. * * * It would be but a mockery to go through the forms of a trial, with such a person upon the jury. The prisoner would not be convicted, however conclusive the proof of his guilt. * * * Their minds were not in a condition to decide the issue according to the law and the evidence. * * * The present case shows the utter incompetency of such a juror. No witness was present when the crime was perpetrated; and yet the evidence leaves not a doubt on the mind of the guilt of the prisoner. * * * If [such a person] had been suffered to go upon the jury, a mistrial would have been the certain result. * * * Persons thus indisposed to execute the laws should never be called upon as jurors to administer them. It would be an idle ceremony to swear such men, well and truly to decide the issue between the people and the prisoner, and a true verdict to render according to the law and the evidence."

In *Donovan* v. *People,* 139 Ill. 412, it was held that the right to challenge prospective jurors is given to the People equally with the defendant, and its exercise by the People, in the exclusion of improper persons from jury service, is frequently as important, and quite as necessary to the due administration of justice, as it is to the defendant for his protection.

Likewise, the principle holds true whether the crime carries a compulsory death sentence, or, as in Illinois, the jury may merely recommend death, the imposition of such penalty being left to the court. As stated in *Puff* v. *United States,* (2d cir.) 211 F.2d 171, (*cert.* denied 347 U.S. 963, 98 L. Ed. 1106, 74 S. Ct. 713,) even on unanimous finding of guilt disagreements would frequently result as to the sentence deemed appropriate. And such disagreement on

successive trials could result in practical immunity from murder.

Defendant takes issue with the above principle, arguing that there are many shades of feelings and beliefs in this modern day concerning capital punishment and an accused should be entitled to a balanced jury composed of as many people who may have sincere and conscientious scruples against such a penalty as those who may not have such objections; that a jury qualified for the death penalty is likely to be a convicting jury and more likely to render a compromise verdict of guilty without death; that though this jury did not render a verdict recommending death yet he was nonetheless prejudiced in that, granting such challenges for cause, the State, in effect, was allowed a greater number of preemptory challenges than allowed by law; that at the time of his alleged offense there was no specific statutory authority granting the State a right to challenge for cause on such ground and in the absence thereof no such right existed.

What defendant seems to be asserting is a right to have some individuals on the jury who may be prejudiced in his favor, someone who is unalterably opposed to one of the possible penalties with which he is faced. One wonders whether he would seek with equal vehemence the right of the State to have some on the jury who sincerely and conscientiously believed in the Old Testament rule of an eye for an eye, or death and death only for murder. Such an arrangement would make for a "balanced" jury. The mere statement of the proposition reveals its utter inadequacy. Defendant's right is the same as that of the State, the right to a jury of twelve, having absolute impartiality.

The argument that a jury qualified for the death penalty is more likely to be a "convicting" jury is pure speculation. The same argument was presented in *Turberville* v. *United States,* 112 App. D.C. 400, 303 F.2d 411, (*cert.* denied 370 U.S. 946, 8 L. Ed. 2d 813, 82 S. Ct. 1596,) and we are so

much in agreement with that court's disposition thereof that we adopt the following quote in its entirety: "[The thesis is] that persons who are not opposed to capital punishment are psychologically inclined against criminals and therefore a jury composed of such persons is not an impartial jury. We understand that this thesis has not as yet received the sanction of any court. We cannot accept it. * * * No proof is available, so far as we know, and we can imagine none, to indicate that, generally speaking, persons not opposed to capital punishment are so bent in their hostility to criminals as to be incapable of rendering impartial verdicts on the law and evidence in a capital case. Being not opposed to capital punishment is not synonymous with favoring it. Individuals may indeed be so prejudiced in respect to serious crimes that they cannot be impartial arbiters, but that extreme is not indicated by mere lack of opposition to capital punishment. The two antipathies can readily coexist; contrariwise either can exist without the other, and, indeed, neither may exist in a person. It seems clear enough to us that a person or a group of persons may not be opposed to capital punishment and at the same time may have no particular bias against any one criminal or, indeed, against criminals as a class; people, it seems to us, may be completely without a controlling convictions one way or the other on either subject. We think the premise for the thesis has no substance."

The final argument by defendant on this point is that without specific statutory provision the State has no right to challenge for cause on these grounds, that prior to the crime with which he was charged there was such statutory authority contained in section 13 of division XIII of the Criminal Code (Ill. Rev. Stat. 1961, chap. 38, par. 743,) stating: "* * * it shall be cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same," that such provision was impliedly

repealed by failure to re-enact the same in the new Code of Criminal Procedure of 1963, which became effective on January 1, 1964.

In effect, defendant is contending that Illinois has abolished capital punishment by indirection, for as demonstrated above inclusion on juries of those who unalterably oppose capital punishment could only result in verdicts consistent with such conviction, *i.e.*, guilty without recommendation of death or a mistrial for failure to agree. We cannot agree that this was the intention of the legislature.

To the contrary, the new Code of Criminal Procedure, section 115—4(d), specifically provides that: "Each party may challenge jurors for cause." We take this provision to mean what it says, that each party, whether it be the State or the accused, is secured in the right to challenge for such cause as may lead to partiality, whatever that cause may be. In substance, section 115—4(d) re-enacts old section 13 of division XIII of the Criminal Code, using broader and more comprehensive language. Failure to use the identical language of the former section or to be as specific does not constitute a repeal of the right defined therein where the new definition is inclusive of the same right. We, therefore hold that under such legislative authority the government has an absolute right to challenge for cause where such cause may be deemed to seriously affect a prospective juror's strict impartiality, and that conscientious scruples against capital punishment, as here involved, constitute proper grounds for disqualification.

Even in the absence of specific statutory authority the overwhelming weight of authority favors disqualification of jurors in capital cases where it is determined that such jurors have settled convictions against infliction of the death penalty. In a comprehensive annotation in 48 A.L.R. 2d 560, it is stated that, with the exception of Iowa and South Dakota, the State as well as the defendant has a right to an impartial jury; that persons opposed to capital punishment to the

extent that it would influence them to disregard the law and the evidence are not qualified to serve; that the State is entitled to the maximum penalty if the proof should justify it and to contend throughout the trial and finally to the jury that the character of the crime justifies it. The decisions in Iowa and South Dakota are to the effect that under a statute which lists numerous specific grounds of challenge for cause but does not include beliefs antagonistic to capital punishment, the State is restricted to use of its peremptory challenges upon this ground. In the light of our views expressed heretofore, such reasoning is not pertinent in this State.

On the basis of the above and a full consideration of the record and the briefs we conclude that the trial was free from any prejudicial error and that defendant was proved guilty of the crime of murder beyond reasonable doubt. The judgment is therefore affirmed.

*Judgment affirmed.*