THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KENNETH WAYNE FETTERMAN, Defendant-Appellant.

(No. 55408;

First District (3rd Division)—August 2, 1973.

Julius Lucius Echeles and Frederick F. Cohn, both of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and Nicholas A. DeJohn, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court:

The defendant, Kenneth Fetterman, was found guilty by a jury of the murders of Anna Karela and her infant daughter, Kimberly. Fetterman was sentenced to the penitentiary for 100 to 199 years for the murder of Anna Karela and to a consecutive sentence of 14 to 20 years for the murder of Kimberly. On appeal the defendant initially argues that the trial court erred in denying his motion to suppress physical evidence seized and oral statements taken from him as a result of an allegedly unlawful arrest.

At 4:30 P.M. on November 17, 1969, Jerome Karela, the husband of Anna and the father of Kimberly, returned from his employment to his home at 3715 Prairie Avenue, Brookfield. He observed that the door leading to his second floor apartment was open, although it was customarily locked. Upon entering the apartment he found the body of his 23-year-old wife lying on the kitchen floor. She had been stabbed many times and was naked from the waist down with her ankles and wrists bound. He called the Brookfield Police Department and then entered the bedroom of his 13-month-old daughter who was lying face up and lifeless in her crib. After this he went to the first floor apartment to check the condition of his grandmother; she was unharmed and unaware of what had taken place in his apartment.

Brookfield police officers arrived at the apartment at approximately 4:40 P.M. The bodies of both Anna and Kimberly were still warm, and

a cloth which had been knotted tightly around the throat of Kimberly was removed. A fire department inhalator was summoned and an unsuccessful attempt was made to resuscitate Kimberly. The cause of her death was determined to be strangulation; her mother died from loss of blood—the result of 35 stab wounds. Large quantities of blood could be seen throughout the apartment.

More police officers arrived on the scene. There was no indication that an intruder had entered by force and a thorough inspection was made of the apartment. A blue receipt card was found on a counter in the kitchen bearing the printed name, Sheridan Peter Pan Studios; it bore the notation "$3.00" and was signed "Kenny." Sergeant Hymel of the Brookfield police, who was participating in the investigation, received no answer when he telephoned Peter Pan Studios. He thereupon contacted Detective Lanners of the Chicago Police Department and asked his assistance in locating the owner of the studios in order to determine the identity of the individual who signed the receipt. From Burton Schender, an owner of the studio, Lanners learned that the only "Kenny" recently employed by Peter Pan was Kenneth Fetterman whose address was 109 South Grove Street, Oak Park. Schender told Lanners that Fetterman's employment had been terminated because his driver's license was revoked or suspended. While employed by Peter Pan he had taken baby pictures on October 14, 1969, in the Karela home. A neighbor reported that Mrs. Karela was expecting the pictures to be delivered. Lanners checked police files and discovered that Fetterman had been previously sentenced to the penitentiary for a sex offense. He also obtained a photograph of Fetterman.

Lanners then went with another detective to the Oak Park Police Station where he met Sergeant Hymel. They were joined by Detectives Grams and Fleming of the Oak Park Police Department, and at about 10:30 P.M. the five officers proceeded to Fetterman's Oak Park apartment. No one responded when they knocked on the door. They then returned to the Oak Park Station and Detective Lanners telephoned the apartment. A woman answered the phone and he asked for "Connie." Apparently misunderstanding him the woman stated, "he is not home." Detectives Grams and Fleming went back to the apartment and kept it under surveillance; they were later joined by Sergeant Hymel and three other officers. At about 5:00 A.M. an officer rang the bell of the apartment and the defendant's mother answered the door. She was asked whether the defendant was home and she said that he was not. After the officers were admitted to the apartment, they told her that they wished to talk with her son in connection with a double homicide in Brookfield as a card from the Peter Pan Studios had been found in the

home of the victims which bore his name. The mother stated that her son did not work for the studio any more because his driver's license had been taken from him. She also informed the officers that the last time her son was at the apartment was the previous evening between 7 and 7:30 P.M. at which time she could hear him washing. At the hearing on the motion to suppress the officers who spoke with her stated that she told them that the defendant washed his raincoat and then left the house. When testifying herself, however, she declared that she did not know whether or not her son washed the raincoat, although she may have told the officers he did. Without objection from the defendant's mother Detective Grams walked into the defendant's bedroom; he seized bottles on top of the defendant's dresser as well as one from a partially opened drawer as he believed they contained illegal drugs. The officers remained in the apartment approximately one-half hour. The mother told them that her son was driving her green AMX car as his car was being repaired.

After leaving the defendant's home most of the officers continued surveillance of the premises; Officer Nelson and Detective Sullivan of the Oak Park Police Department joined them. Shortly after 9:00 A.M. the defendant drove the green AMX automobile into the alley behind 109 South Grove and stopped in front of the garage. Sullivan approached the vehicle with his gun drawn and announced his office. Nelson opened the door of the car on the driver's side and Fetterman stepped out. He was arrested and was "patted down" by Sullivan. Meanwhile, Nelson looked into the car and saw a map and a light colored trench coat. Sergeant Hymel walked up to the car and noticed that the map had reddish brown stains on it and that it was a map of Brookfield. He also observed a newspaper featuring the Karela murders, and a stain on the driver's side of the car which appeared to be dried blood. The defendant was warned of his constitutional rights and was informed he was being taken into custody as a result of the investigation of the murders in Brookfield and for the possession of dangerous drugs.

An arrest without a warrant is lawful if a criminal offense has been committed and the arresting officer has a reasonable basis for believing that the person arrested committed it. (*People v. Wright* (1969), 42 Ill.2d 457, 248 N.E.2d 78; *People v. Asey* (1967), 85 Ill.App.2d 210, 229 N.E.2d 368.) The test whether the officer has reasonable grounds for his belief is whether a reasonable and prudent man, having the knowledge the officer possessed would believe the person arrested guilty of the offense. (*People v. Carroll* (1971), 133 Ill.App.2d 78, 272 N.E.2d 822.) The officers who arrested Fetterman knew that he had been convicted of a sex offense, and had been in the Karela home taking baby

pictures about one month before the murders. The condition of Mrs. Karela's body, riddled with knife wounds and naked from the waist down to her ankles with her wrists and ankles tied, strongly suggested that sexual perversion might be connected with the crime. The entry into the Karela apartment did not appear to have been forced and it was, therefore, likely that the perpetrator of the crime was someone known by Mrs. Karela. She was expecting the baby pictures to be delivered; it was reasonable to infer that she would have admitted Fetterman into her home thinking he was bringing them.

■■ Also, the apartment contained pools of blood, and it seemed obvious that her murderer could not have escaped without getting blood on his clothing which he would desire to remove. The police had learned that on the single, brief occasion Fetterman returned to his apartment between the time of the crime and that of his arrest, he washed his raincoat. He then left his apartment without informing his mother where he intended to spend the night and did not return until 16 hours later. Reasonable cause to make an arrest means something less than evidence which would result in a conviction, and the existence of probable cause depends upon the factual and practical considerations of every day life. (*People v. Jones* (1967), 38 Ill.2d 427, 231 N.E.2d 580.) Therefore, having considered all the facts and circumstances known to the police officers, we conclude that they had probable cause to arrest the defendant for the murders of Anna and Kimberly Karela. Having reached this conclusion, there is no need to discuss the defendant's alternative contention that the arrest was unlawful because there was no probable cause to arrest him as a narcotics violator; nor is there need to consider the extent to which he could be interrogated and his vehicle searched if he had been arrested for driving without a driver's license.

■■ Following his arrest Fetterman made an admittedly false exculpatory statement which he contends should have been suppressed. In deciding this question it must be determined whether he was informed of his constitutional rights and given the opportunity to exercise them. The State's testimony showed that he was advised of his rights on three separate occasions. He was informed of them at the time of the arrest; at the Oak Park Police Station he was advised of his rights before he was charged with a narcotics offense and he was warned again before the inquiry began into his involvement in the Karela murders. Fetterman told the officers that he understood them. There was also testimony that a telephone was located near him when he was being questioned, and that he declined the opportunity of using it. On the other hand, Fetterman testified that when he was arrested he was not advised of

any rights. He said that subsequently he was advised of the right to remain silent, but he was not permitted to telephone a lawyer although he requested an opportunity to do so. The trial court's finding that the defendant was informed of his constitutional rights was supported by the great weight of the evidence, as was its decision to deny the motion to suppress the defendant's statement. The statement was given freely without any compelling influences and was admissible. *People v. Washington* (1969), 115 Ill.App.2d 318, 253 N.E.2d 677.

██ Fetterman also argues that a band-aid taken from his hand by the police after his arrest should have been suppressed. The officers had reasonable cause to believe he had stabbed Anna Karela. Evidence that his own hand had been cut was material and relevant to prove his guilt for it could be inferred that he sustained the cut when he committed the crime. In *People v. Hester* (1968), 39 Ill.2d 489, 237 N.E.2d 466, the seizure of a suspect's bloody clothing in the course of a police investigation was approved and we see no reason why the defendant's band-aid should be treated differently.

██ After the defendant was taken into custody the green AMX automobile was brought to the Oak Park Police Station where it was searched and physical evidence was seized. Fetterman contends that the search and seizure were improper. We find that the actions of the officers were correct. Assuming as they did that Fetterman was the perpetrator of the crimes, the officers might reasonably have expected to find evidence in his automobile tending to establish his guilt. They had observed the map of Brookfield with the reddish brown stains on it and Fetterman's coat merely by looking in the door and window of the automobile. These could have been seized immediately and justified by the plain view doctrine. (*People v. Joyner* (1972), 50 Ill.2d 302, 278 N.E.2d 756.) That the automobile was moved from the alley to the police station where it was thoroughly searched creates no constitutional difficulty; this procedure was sanctioned in *Chambers v. Maroney* (1970), 339 U.S. 42, 26 L.Ed.2d 419, 90 S.Ct. 1975. There it was observed that the auto which could have been properly searched on the highway could just as well be searched without a warrant at the police station, since probable cause to search it continued. The movement of the vehicle to the police station created no duty to get a search warrant. (*Cf. People v. Canaday* (1971), 49 Ill.2d 416, 275 N.E.2d 356.) Therefore, the defendant's motion to suppress the physical evidence was properly denied.

As to the trial itself, the defendant's principal contention is that the evidence was insufficient to sustain the guilty verdict. It was established

that Fetterman, while an employee of the Peter Pan Studios, visited the Karela residence on October 14, 1969, and took photographs of Kimberly. The pictures were scheduled to be delivered to the Karelas during the week beginning November 10th, but they were still at Peter Pan Studios on November 17th, the day the murders were committed. Fetterman's last day as a photographer was October 17th.

Between 11:00 A.M. and noon on November 17th, Fetterman and an acquaintance, Overton Tyson, were visiting a mutual friend, Shirley Schmelter, at her home at 3142 West Belden Avenue, Chicago, where she lived with her mother, Mrs. Rose Parr. Fetterman and Tyson drove from her home in Fetterman's green AMX automobile to purchase cigarettes. While doing so Fetterman asked Tyson to join him in robbing a house in the suburbs where he had taken a baby's picture. Tyson testified that Fetterman told him that the lady and the baby would be at home when he robbed the house, and that when he originally took the baby's picture the lady turned around and "hit him in the face with her tit." Although Tyson admitted in his testimony that years earlier he robbed houses, he refused to accompany the defendant and returned to Shirley Schmelter's home with the cigarettes. Before he drove away Fetterman said he would meet Tyson there at 4:00 P.M., but Tyson did not see him any more that day.

Mrs. Bonnie Byrkett testified that she saw Fetterman at her home near Logan Square at 12:30 P.M. on November 17th. He told her he was working for Peter Pan Studios and that it was a good job. He left her home at about 1:00 P.M. in a green AMX car. He drove to the North Cicero Dodge agency where his car was being repaired. According to the testimony of two witnesses he arrived there about 1:15 P.M. and left about 2:00 P.M.

Anna Karela and Kimberly returned to their second floor apartment at 2:30 P.M. after visiting a neighbor, Mrs. Phillip Saso, who resided at 3709 Prairie Avenue, Brookfield. At approximately 3:30 Mrs. Saso observed a dark green car with sloping top and head rests parked between the building next to her home and the Karela home. There was no other car around it on her side of the street. Some time between 2:30 and 4:30, the time Jerome Karela arrived home, Anna was stabbed and Kimberly was strangled. The slayer did not enter the apartment by force. Mrs. Saso testified that when Mrs. Karela would hear someone desiring admittance at the street entrance, it was customary for her before going to the door to place Kimberly in the crib so that she would not fall down the stairs. Kimberly's body was found in her crib with her shoes on. When the police arrived in response to Jerome Karela's call, the card signed by the defendant was discovered on a kitchen

cabinet. Karela did not remember seeing it there when he left for work that morning.

Fetterman returned to Bonnie Byrkett's home at 5:00 P.M., and he arrived at his own apartment about two hours later. He remained there long enough to wash himself and his raincoat, and then went back to Shirley Schmelter's home, arriving around 8:00 P.M. Schmelter testified that he looked a little "sloppier" than usual, and that he stayed and talked to her all night although he had never done so before. Her mother, Rose Parr, testified that Fetterman was nervous that evening and that he was constantly moving his fingers. He did not leave their home until 6:00 A.M., November 18th.

Approximately three hours later he was arrested and taken to the Oak Park Police Station where he was interrogated regarding the Karela murders. He told the police that between 2:30 and 4:00 P.M. on November 17th he was visiting Jerry Coates, a friend, who lived at 2633 North Kimball Avenue, Chicago, and that about 4:00 P.M. he returned to the home of another friend, Dave Byrkett, where he had been earlier that day, and spoke with Byrkett's wife. He suggested that the police contact Jerry Coates who would inform them where he was between 2:30 and 5:00 P.M.

The police did so. At first Coates told them that he and Fetterman were driving around together between 2:00 and 4:30 P.M. Subsequently he admitted that this was untrue. He said that Fetterman came to his home at 7:30 A.M. on November 18th and told him that he was in trouble concerning a murder in Brookfield. Although Fetterman denied involvement in the crime, he asked Coates to cover for him between 2:00 and 4:30 on November 17th, and Coates agreed. He gave him a gun which Coates kept for a time and then returned it to Fetterman's mother.

While Fetterman was being questioned by the police on November 18th several cuts were observed on his right hand. These were located in the palm, upon two fingers and near the base of the thumb. Fetterman stated that he sustained the cuts at about 10:00 P.M. on November 17th when he and his friend, Overton Tyson, were making a Molotov cocktail with a large peach can. Tyson denied seeing the defendant on the evening of November 17th and Schmelter stated he was at her home during that period of time.

On the evening of November 18th Rose Parr telephoned the police that a bag containing a green corduroy jacket and a blue shirt had been found in her home on a high shelf at the rear of the dining room closet. Shirley Schmelter had seen Fetterman wearing the jacket and Tyson had observed it in the AMX car about noontime on the 17th. Tyson had

also seen Fetterman wearing the shirt. The jacket bore stains which Marian Caporusso, a microanalyst, testified were caused by human blood.

The police had removed a section of wallboard from the Karela apartment which contained smears of type B blood, the blood type of Anna Karela. The blood upon the corduroy jacket was also type B. In examining the wallboard Mrs. Caporusso noted that there was a distinct ridge impression in the blood smears. She made a test by taking a portion of the right front pocket of the jacket and staining it with an ink dye. She then rubbed the fabric across various surfaces. She found that the ink stain was deposited with the same identical number of ridges and with the same distance between the ridges as was observed in the blood smears on the wallboard from the Karela apartment.

From the bandage taken by police from Fetterman's finger, it was established that his blood was type A. Jerome Karela had type O blood. Type O blood was not discovered in the apartment, but type A was found on the bedspread in the Karela bedroom and on the banister leading from the Karela apartment to the first floor. Blood type A was also found on the map of Brookfield in the automobile Fetterman was driving on both November 17th and November 18th.

Three small pieces of glass were found in a pool of blood in the Karela apartment. When these were examined it was determined that they were stained with both type A and type B blood. The fragments of glass came from a spectacle lens. Although they were too small to permit a determination as to their axis, John Davis, manager of the Lens Development Division of the American Optical Corporation, tested them and found their prescription to be minus .75 spherical base and minus .75 cylinder. Dr. Rudolph Abraham examined Fetterman's eyes in 1968, and wrote him a prescription of minus .75 sphere and minus .75 cylinder for the right eye. Such a prescription was filled for Fetterman by Vincent Juliano, an optician.

Fetterman did not testify at the trial. His defense consisted of an attempt to discredit the State's proof by producing conflicting testimony and by pointing out inconsistencies in the evidence. For example, a neighbor of the Karelas, Leonard Skortz, testified for the defense that when he came home from work at 3:30 on November 17th he noticed three or four cars parked along the street, not merely one as Mrs. Saso had testified. Indeed, in a written statement to police given shortly after the crime, she made no reference to the green car which she testified she had seen. Mrs. Saso declared that the car had head rests; Fetterman's AMX had none. She explained, however, that by head rests she meant

that the seats were built up, and it was established that the seats in the AMX had high backs.

The defendant had suggested other factors which he contends create a doubt of his guilt. First, he attempted to show that if he had been at the Karela residence at 3:30, he could not have driven to the Logan Square area and arrived there by 5:00 P.M., and that the estimates of the traveling time for the distance provided by the State indicating the contrary were not accurate. Second, the defendant notes the failure of any prosecution witness who saw him prior to the morning of November 18th to recall observing cuts on his right hand. Third, he points out a discrepancy as to the date given by Vincent Juliano for the filling of his prescription and that listed on a receipt which was given to him by Juliano. Since Juliano said he filled the prescription written by Dr. Abraham, and the defendant had only been seen on one occasion by the doctor, the precise date of the examination by him was also called into question. Finally, the defendant suggests that the testimony of Tyson and Coates is of doubtful value. Tyson originally told the police that he saw Fetterman at 4:00 P.M. on November 17th. Later he declared that this statement was untrue. Therefore, the defendant urges that Tyson's testimony as to other occurrences should be accorded little significance. The reliability of Coates' testimony is questioned because the prosecutors had told him that they would help him out of a violation of probation charge if they could.

However, the defendant's evidence was not without inconsistency of its own. His mother testified that she saw him on the evening of November 17th at their home in Oak Park at about 7:00 P.M. Yet, Mrs. Nora LePard, another defense witness, stated he was in a restaurant she owned near Logan Square from 5:30 P.M. until 7:40 P.M. on the 17th.

■■ All this evidence was presented to the jury. A jury's determination of a defendant's guilt will not be set aside by a reviewing court unless it is so unsatisfactory as to cause a reasonable doubt of his guilt. (*People v. Tribbett* (1968), 41 Ill.2d 267, 242 N.E.2d 249.) Fetterman's conviction was based on circumstantial evidence. There is no distinction in law between direct and circumstantial evidence. Circumstantial evidence is legal evidence and it is accorded the same weight and effect as direct evidence. A conviction based on circumstantial evidence will be sustained when the evidence is of such a convincing character that it satisfies the jury and the reviewing court beyond a reasonable doubt that the defendant committed the crimes of which he is accused. (*People v. Gavurnik* (1954), 2 Ill.2d 190, 117 N.E.2d 782.) The formidable

array of cogently probative circumstances before, at the place of and after the vicious slayings, established Fetterman's guilt beyond all reasonable doubt.

■■ The defendant asserts that certain rulings of the trial judge denied him a fair trial. During the prosecutor's direct examination of Overton Tyson the subject of the corduroy jacket found in the closet at the Parr home was mentioned. Tyson was asked: "How did you have occasion to see the coat?" He answered: "Well, the police came and they said that he [the defendant] was arrested for narcotics." The court sustained the defense counsel's objection to this answer and instructed the jury to disregard what the police told Tyson. The court denied the defendant's motion for a mistrial and he suggests that this was error. It is clear that the prosecutor did not elicit Tyson's reply which was unresponsive to his question. No further reference was made to a narcotics offense during the trial and we do not believe the one isolated remark was so prejudicial that Fetterman was deprived of a fair trial. *Cf. People v. Naujokas* (1962), 25 Ill.2d 32, 182 N.E.2d 700.

■■ The next complaint is that the court limited his cross-examination of Tyson. Defense counsel adduced the admission from Tyson that in November 1969 he was taking "yellow jackets," a type of narcotics. However, Tyson refused to tell where he obtained them. The defense moved that, in order to test his credibility, Tyson be compelled to state the name of the person from whom he obtained the pills. The court denied the motion and the defendant moved for a mistrial which the court also denied. The latitude to be allowed in cross-examination is in the discretion of the trial court and it is only where there has been clear abuse of the discretion resulting in manifest prejudice to the defendant that a reviewing court will interfere. (*People v. George* (1971), 49 Ill.2d 372, 274 N.E.2d 26; *People v. Halteman* (1956), 10 Ill.2d 74, 139 N.E.2d 286.) The trial court did not unduly restrict the cross-examination of Tyson, but rather permitted a wide latitude on all relevant matters. (*Cf. People v. Haygood* (1965), 60 Ill.App.2d 70, 208 N.E.2d 373.) The court allowed the jury to hear Tyson's admission that he used narcotics during the month the crimes were committed against the Karelas. There was no allegation that Tyson was under the influence of drugs when the events occurred about which he testified; there was no offer of proof that Tyson was either charged with a narcotics offense or that he was testifying for the State in order to escape prosecution, nor was he questioned about any understanding regarding favorable treatment in exchange for his testimony. The identity of Tyson's supplier of narcotics was irrelevant to Tyson's credibility; the important fact was that he

used narcotics, which testimony was permitted. The defendant's motions were properly denied.

■■ The defendant charges that the State's cross-examination of Nora LePard violated his right to a fair trial. On direct examination Mrs. LePard testified that Fetterman had visited her restaurant early on the evening of November 17th. She said she saw neither blood nor band-aids on his hands. On cross-examination she explained that she looked at Fetterman's hands on that evening because her nine-year-old son was curious about a scar on the back of his right hand between the index finger and the thumb. The prosecutor attempted to establish that her attention had been called to Fetterman's hands not by her son's reference to a scar but by a cut. Mrs. LePard and her son had given statements to the prosecution. She was also present when her son was questioned by a police sergeant and an assistant State's attorney, and remarks she made at that time clarified her son's answers and disclosed her own recollection. At the trial the prosecutor questioned her about parts of the statement which he referred to in an attempt to impeach her testimony. What a person said on a previous occasion contrary to what is said in court may be used for impeachment. (*People v. DeBerry* (1966), 72 Ill.App.2d 279, 219 N.E.2d N.E.2d 701.) Even though the question and answer statement also contained answers to her son, its use to establish her prior inconsistent statements to impeach her credibility was not improper. *Cf. People v. Rainford* (1965), 58 Ill.App.2d 312, 208 N.E.2d 314.

■■ One of the questions in the statement was: "* * * Do you remember his cut?" To this Mrs. LePard had answered: "I remember him [her son] saying, 'Kenny, what happened to your hand, did you cut yourself?' That I remember." When asked at the trial whether she recalled that question and answer, she stated: "My son wouldn't know the difference between a cut and a scar." Although this reply was not responsive, the jury could derive the impression from it that the word "cut" had been used by her son. The prosecutor subsequently asked her whether her son asked Fetterman, "Did you cut yourself?" She stated: "I think he did ask him that." Her answer, which admitted the query about the cut, was in agreement with her prior written response and in conflict with her direct testimony, and it was proper for the jury to consider it in determining her credibility.

■■ The prosecutor then inquired: "As a matter of fact, your son also mentioned a band-aid —". At this point defense counsel objected and Mrs. LePard said: "No, he didn't." The attorney moved for a mistrial, which was denied. The court did not rule upon the defendant's objection

but the prosecutor made no further reference to the question in his cross-examination. The prosecutor's unfinished question did not result in reversible error. First, it is difficult to determine the propriety of the question since the question was not completed. Second, Mrs. LePard had denied during direct examination that there was any bandage on Fetterman's hands and her interjection, "No he didn't" was consistent with her direct testimony. If prejudice occurred to the defendant it was indeed slight. Third, on redirect examination the defendant's counsel used the son's statement in an effort to establish that all that was noticed on Fetterman's hands was an old scar. Any harm the defendant might have sustained as a result of Mrs. LePard's cross-examination was mitigated by her redirect examination.

■■ The defendant next suggests that reversible error occurred because the State was permitted to select a guilty prone jury when it excused all jurors with scruples against the death penalty. However, the jury did not recommend imposition of the death penalty and the contention raised by the defendant has been consistently rejected. *People v. Brooks* (1972), 51 Ill.2d 156, 281 N.E.2d 326; *People v. Cesarz* (1969), 44 Ill.2d 180, 255 N.E.2d 1; *People v. Hobbs* (1966), 35 Ill.2d 263, 220 N.E.2d 469.

Finally, the defendant contends that the jury was not adequately instructed. In his abstract he has included only three refused instructions and a fourth which he asserts should have been given in more complete form. When an abstract includes only the instructions complained of, without regard to the other instructions both given and refused, error cannot be predicated upon the giving, refusal or modification of instructions, since this court is not obligated to search the record to ferret out reasons for reversal or to supply abstract deficiencies. (*People v. Robinson* (1963), 27 Ill.2d 289, 189 N.E.2d 243; *People v. Allen* (1959), 17 Ill.2d 55, 160 N.E.2d 818; *People v. Brown* (1972), 3 Ill.App.3d 796, 278 N.E.2d 556; *People v. Millner* (1968), 92 Ill.App.2d 245, 236 N.E.2d 8.) The defendant's last contention, therefore, will not be considered.

The judgment is affirmed.

Affirmed.

McNAMARA and McGLOON, JJ., concur.