THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* COUNT DUBORIS SPENCE, Defendant-Appellant.

First District (4th Division)   No. 62448

Opinion filed November 17, 1976.

Julius Lucius Echeles and Frederick F. Cohn, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Larry L. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Count Spence was indicted for murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1), and, after a jury trial, he was sentenced from 19 to 49 years of imprisonment. He appeals from his conviction and raises the following issues for review: (1) whether a warrantless arrest at home, several hours after the accused has been identified as the assailant, violates the fourth amendment to the United States Constitution; (2) whether a lineup is unnecessarily suggestive when the accused has characteristics that are different from those of the other participants; (3) whether the cumulative effect of the following acts by the prosecutor denied the defendant his constitutional right to a fair trial:

> (a) the prosecutor's presentation of evidence that two nontestifying witnesses had implicated the defendant, and the reliance on this evidence in his closing argument;
>
> (b) the prosecutor's final argument was prejudicial;
>
> (c) the prosecutor commented on the invocation by the defendant of his fifth amendment right to remain silent and his sixth amendment right to counsel;
>
> (d) the prosecutor introduced evidence that was the fruit of an illegal arrest;
>
> (e) the court improperly refused to permit the jury to read a letter used by the prosecution to impeach the defendant's mother;

and (4) whether defendant's minimum sentence was excessive.

The State presented the following evidence at the trial. Dale Miller testified that on June 13, 1973, he and John Bruegger were traveling in a pickup with a camper attachment, along with two other men, when they stopped at Cermak and Federal in the city of Chicago. Miller testified that Bruegger was riding in the passenger seat reading a map when he heard a sound "like a firecracker going off." Miller looked at Bruegger and discovered that he had slumped in his seat and blood was running down his forehead. The witness jumped out of the truck and ran to the rear of the vehicle so he could let the passengers out of the camper and, when he reached the rear door of the vehicle, he saw a man running down the street whom he identified as the defendant. Miller described the man as being a 5-foot 9-inch black male with a moustache, wearing a two-piece rose colored outfit. As the assailant fled down the street in a southerly direction, Miller observed the defendant for 25 to 30 seconds. After the defendant disappeared behind the building, Miller let the two passengers out of the camper where they were soon joined by Patrick Colvin, a police academy cadet.

Patrick Colvin testified that he was driving westbound on 22nd Street when he reached the intersection of 22nd and Federal. As the witness

slowed down, fearing that someone might get out of the camper, he heard a shot. Colvin testified that he noticed that the passenger leaned back and fell over to his left. Approximately an arm's length from the passenger door, the witness observed a 16-year-old black male, about 5 feet 9 inches tall, weighing about 125 pounds with a moustache and wearing a solid colored outfit. After firing the shot, the witness testified that the assailant, identified in court as the defendant, fled southbound on Federal. Colvin watched the defendant for 2 or 3 seconds, made a "U" turn and parked next to the camper. Then he had a conversation with Dale Miller and transported the injured man to Louise Burg Hospital.

Ronnie Rainey, a resident of the area who was on a ball field at 2250 State Street drinking water from a fire hydrant, testified that he heard a noise that sounded like a firecracker coming from the direction of 22nd and Federal. Rainey looked in that direction and saw Count Spence running toward him with his hands in his shirt. Spence told Rainey to run and the two men proceeded to the 2250 State Street building. After arriving at the building, Spence told the witness that he had shot a man and showed him a gun that he took from underneath his shirt.

Paul Carrol, an investigating officer, testified that at approximately 7:30 p.m. on June 13, 1973, he responded to a radio assignment and proceeded to Mercy Hospital. Upon his arrival, he observed Sergeant Donald Smith, Officer Young, and Mr. Miller. After talking briefly with Sergeant Smith, Carrol drove to 23rd and State and started talking to people in the area. The officer talked with a Mr. Marcus and then he went to the defendant's apartment. There, Carrol had a conversation with Mrs. Spence and, a short time thereafter, he talked with the defendant after he was advised of his constitutional rights. When Carrol left the Spence apartment, he visited Mr. Marcus at his home and then he talked with a Mr. Lay at his home.

The following day, the officer began his tour of duty around 6 p.m. and proceeded to Mercy Hospital where he had a conversation with Investigator Caccitolo of Area One Homicide. When he concluded the conversation, Carrol proceeded to the defendant's apartment while Caccitolo proceeded to Dale Miller's motel. When Carrol arrived at the Spence apartment around 8:30 p.m., the defendant was arrested and *Mirandized*. Then he was transported to Area One Homicide and placed in a large interview room where he was held until a lineup was conducted later that evening.

After the State rested, Mrs. Flossie Spence testified for the defense. Mrs. Spence testified that on June 13, 1973, she was in the Loop shopping and she returned home around 6:45 p.m. As she approached her apartment building, she saw her son and he accompanied her upstairs. After arriving home, the witness was told that her son had been in a fight

so she rode the elevator to the first floor and told him to return to the apartment. While proceeding to their apartment, they stopped by Mrs. White's apartment and returned home around 8:30 p.m. Once Mrs. Spence returned to her apartment, she testified that Count remained home for the remainder of the evening. On cross-examination, the witness admitted writing a letter to the mayor of Chicago in which she stated that her son did not shoot anyone because he was in front of the building.

Count Spence was the final witness called to testify by the defense. The defendant testified that on June 13, 1973, at about 2:30 p.m., he was waiting in front of the building for his sister to come home from school. When his sister's bus arrived, he helped her to their apartment where he remained until his mother went downtown. Spence testified that he went outside and waited in front of the building until his mother returned from her shopping trip. Upon her return, Spence accompanied her to their apartment. The defendant then returned to the front of the building but was soon joined by his mother. While returning to their apartment, Spence and his mother went to Pat White's apartment and then they returned to the Spence apartment where the defendant remained for the remainder of the evening. Spence denied shooting John Bruegger and denied telling Ronnie Rainey that he shot a man. After the State cross-examined Spence, both sides rested.

■■■ Defendant contends that he was arrested in violation of his constitutional rights; therefore, the fruits of the unlawful arrest, the lineup identification, and the in-court identification must be suppressed. In Illinois, an arrest may be made by a police officer (1) when he has a warrant, (2) when he has reasonable grounds to believe that a warrant has been issued in this State or another jurisdiction, or (3) when he has reasonable grounds to believe that the person is committing or has committed an offense. (*People v. Evans* (1976), 42 Ill. App. 3d 902, 356 N.E.2d 874; Ill. Rev. Stat. 1973, ch. 38, par. 107—2(c).) The facts reveal that there were no outstanding warrants in this jurisdiction or in another jurisdiction so the question turns on whether the officers reasonably believed that a crime had been committed and the defendant was the perpetrator of the offense. Reasonable cause to make an arrest means something less than evidence which would result in a conviction, and the existence of probable cause depends on the factual and practical considerations of everyday life. (*People v. Fetterman* (1973), 14 Ill. App. 3d 120, 126, 302 N.E.2d 218.) We think the facts known to the officer gave him probable cause to make the arrest. The arresting officer had a description of the defendant that he obtained from two eyewitnesses to the crime. Along with the descriptions of the eyewitnesses, the police had information provided by residents of the area. One resident told the officers that he saw the defendant running from the scene of the crime

while wearing a rose colored outfit, and another neighborhood youth observed the defendant with a gun in his possession shortly after the crime.

■■■ The defendant argues that the seizure of his person is subject to the warrant requirement when it occurs, as it did in the instant case, at night in his home. He relies on *Dorman v. United States* (D.C. Cir. 1970), 435 F.2d 385, 389, as authority for his position. Although *Dorman* is persuasive, we think there are some other cases which dispose of this question. In a recent Supreme Court decision, *United States v. Watson* (1976), 423 U.S. 411, 417-19, 46 L. Ed. 2d 598, 605-06, 96 S. Ct. 820, 825, the court, while construing the warrant provision of the fourth amendment, held that a peace officer may arrest a person without a warrant for a felony not committed in his presence if there are reasonable grounds for making the arrest. In light of *Watson*, it is clear that warrantless arrests, like the one herein, which are based on probable cause are permissible. The question which appears unsettled is whether an officer may enter a suspect's home to make a warrantless arrest. This court has held that a warrantless arrest at defendant's home was permissible in spite of the fact that 10 hours elapsed between the naming of the defendant as the assailant and the seizure of his person, because there was no evidence introduced that a warrant could have been obtained, and the information relied on by the officer was reliable. (*People v. Mitchell* (1975), 35 Ill. App. 3d 151, 161, 341 N.E.2d 153.) The information the officers had acquired, the descriptions from the two eyewitnesses to the crime coupled with the information received from the neighborhood youths, was reliable. And, although considerable time elapsed between the time defendant was named as the assailant and arrested, there is no evidence in the record to establish that a warrant could have been obtained. Inasmuch as warrantless arrests, based on probable cause, have not been made unlawful because the accused was arrested for purposes of investigation (*People v. Jenkins* (1975), 31 Ill. App. 3d 910, 916, 335 N.E.2d 87), we will not overturn the instant conviction because the officer told the defendant he was being seized so he could be placed in a lineup. Therefore, we hold that the court did not err in denying defendant's motion to quash the arrest and the evidence complained about was properly admitted at the trial.

■■ Defendant's next contention is that the lineup was unnecessarily suggestive because he was the only person in the lineup with characteristics matching those of the assailant—he had a shirt similar in color to the one worn by the assailant—and he was the only participant with a moustache and a red streak in his hair. The burden is on the defendant to prove that a pretrial lineup procedure is unfair. (*People v. Kinzie* (1975), 31 Ill. App. 3d 832, 834, 334 N.E.2d 872.) After reviewing

the record, we do not think the defendant has met this burden. Although as the defendant points out, there were some characteristics which might be arguably suggestive, his hair and noticeable moustache, we do not think there was a substantial likelihood of irreparable misidentification. (*Neil v. Biggers* (1972), 409 U.S. 188, 198, 34 L. Ed. 2d 401, 93 S. Ct. 375; *People v. Rosenborgh* (1974), 21 Ill. App. 3d 676, 684-85, 315 N.E.2d 545.) The two witnesses who testified at the hearing to suppress the identification, Patrick Colvin, a motorist who was driving down the street when the offense occurred, and Dale Miller, the driver of the vehicle in which the deceased was riding, had an adequate opportunity to view the assailant, on a clear day, for a short period of time, as he fled from the scene. Even though it might be argued that the police did not exhaust all possibilities in selecting persons physically comparable to defendant, we do not think that the evidence must be excluded. The question becomes whether from the totality of the circumstances the witnesses' in-court identification had an independent origin from the possibly suggestive confrontation. (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 513, 250 N.E.2d 152.) The factors to be considered in evaluating the likelihood of misidentification include (1) the opportunity of the witness to view the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. (*Neil v. Biggers* (1972), 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 93 S. Ct. 375.) It has already been established that the witnesses had an opportunity to view the assailant. Moreover, they were positive in their identification which occurred the day after the crime. After weighing all factors, we hold that there was no substantial likelihood of misidentification and the evidence was properly admitted.

Finally, the defendant argues that the cumulative effect of various errors deprived him of his constitutional right to a fair trial. Three of the alleged errors can be disposed of simultaneously: (1) that the defendant was denied a fair trial when the prosecutor presented evidence that two nontestifying witnesses had implicated the defendant, and then relied on such evidence in final argument; (2) that the prosecutor's final argument was prejudicial because it asserted that the two nontestifying witnesses failed to appear in court due to personal peril; and (3) that the prosecutor by evidence and comments during opening and closing argument informed the jury that the defendant invoked his fifth and sixth amendment rights to counsel. We noted after examining the record, that these contentions were not raised in defendant's written motion for a new trial. In order to preserve a question for review in the appellate court, the aggrieved party must raise the grounds in a post-trial motion and is limited to a review of the grounds delineated because all other grounds or

errors are deemed waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 283, 296 N.E.2d 856; *People v. Maxon* (1976), 35 Ill. App. 3d 670, 341 N.E.2d 479.) Accordingly, we will not consider the claimed errors not included in the post-trial motion, and the three issues raised by the defendant, for the first time on review, are waived. *People v. Killebrew* (1973), 55 Ill. 2d 337, 342, 303 N.E.2d 377.

The defendant also contends that he was denied a fair trial by the prosecutor's introduction of testimony demonstrating that the defendant was identified at a suggestive lineup that was a direct result of an illegal arrest. This issue was disposed of earlier in this opinion.

■■ Finally, the defendant contends that the court improperly refused to permit the jury to read from a letter used by the prosecution to impeach defendant's mother. Nevertheless, our review of the record revealed that the State never introduced the letter complained of into evidence. While it is in the trial court's discretion to allow or refuse a jury's request for a review of testimony (*People v. Pierce* (1974), 56 Ill. 2d 361, 363-64, 308 N.E.2d 577), it is not error to refuse a jury's request for evidence not in the record. (*People v. Autman* (1974), 58 Ill. 2d 171, 176, 317 N.E.2d 570.) Therefore, after considering the cumulative effect of the alleged errors raised by the defendant, and after concluding that they are without merit, we hold that defendant was not deprived of a fair trial.

■■ The defendant's last contention is that the sentence of 19 to 49 years was excessive, and he argues that his sentence should be reduced to the minimum sentence of 14 years provided for in the Criminal Code. We feel that the trial court is in a superior position to determine the appropriate sentence for a defendant, and the court held a full hearing in aggravation and mitigation as required by section 5—4—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—4—1). While, as the defendant alleges, background is a factor to be considered, so also are the nature and circumstances surrounding the crime. Inasmuch as the defendant's sentence was within the limits prescribed by section 5—8—1(c)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(c)(1)), we will not reduce the sentence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DIERINGER and ADESKO, JJ., concur.