(No. 24575.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAM GARAFOLA, Plaintiff in Error.

*Opinion filed June 20, 1938—Rehearing denied October 5, 1938.*

HAROLD L. LEVY, (CHARLES R. AIKEN, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and BLAIR L. VARNES, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant, Sam Garafola, was found guilty by a jury in the criminal court of Cook county of the crime of assault with intent to commit rape. The cause is here by writ of error for a review.

Jeanna Bell, an unmarried woman twenty-one years of age, was employed at the time of the alleged assault, October 5, 1936, as a singer and entertainer at the Wharf Cafe in Chicago. Defendant, a bartender, and Daniel Callahan, a liquor salesman, came into the Wharf Cafe about two o'clock that morning just after prosecutrix and Pattie Sherwin, another entertainer, had finished their work and had changed to their street clothes. Avenarius, owner of the Wharf Cafe, introduced defendant and Callahan to prosecutrix and Miss Sherwin. The men bought a few drinks, but whether prosecutrix was drinking liquor is disputed. She testified that she drank only a lemon and seltzer; that she had had three drinks of liquor in the early part of the evening to relieve the pains caused by menstruation but drank no more. Defendant, Callahan, Pattie Sherwin, and the bartender, Nick Martelli, testified she drank liquor with them. About 3:00 o'clock that morning it was agreed that the defendant, Callahan, Jeanna Bell, Pattie Sherwin, Avenarius, Nick Martelli and a waiter named Paul, would go to a tavern called "The Green Front." They went in different cars, Avenarius, Miss Bell and defendant riding in Avenarius' car. She did not object, but stated this was her second night in Chicago and Martelli had told her earlier that evening he would take her to the elevated station; that when this party was suggested she made some inquiry as to how she would get home and that Avenarius told her he would see that she got home all right. In this she is uncorroborated. Avenarius did not testify. At The Green Front several rounds of drinks were bought. Miss Bell says she had nothing to drink but ate something. Again she is contradicted by defendant, Callahan, Pattie Sherwin, and Nick Martelli. Avenarius and Martelli were the first to leave The Green Front. According to prosecutrix, she was eating at that time and did not notice them leave. Defendant, Callahan, Pattie Sherwin, and Martelli testified Avenarius asked Miss Bell if she wanted to ride home with

him and that she replied she would stay with the party. Prosecutrix and defendant left The Green Front together about 4:00 o'clock A. M. in a taxicab, but their testimony conflicts as to whether it was mutually agreeable or whether defendant entered the taxicab over her protest.

Prosecutrix testified she gave the driver of the taxicab her home address and that defendant directed the driver to take them to the Bernice Hotel on South Michigan avenue; that she kept insisting she was going home alone and defendant struck her in the face with his fist. She told him she understood what he meant but that she did not feel well and was going home; he then grabbed her, laid her down on the seat, and got on top of her; her clothes were up to her waist and he was trying to take her pants off and to unbutton his trousers, but was unable to because she kept fighting him; that she pleaded with him to leave her alone; that she was sick but he said that didn't make any difference; she fell on the floor and tried to open the door to jump out but he grabbed her and said "Oh, no you don't! You are still going to the hotel with me," and pulled her back on the seat of the cab. All this time defendant continued to beat her in the face. As the cab was stopping in front of the Bernice Hotel she managed to open the cab door and jump out and began running across Michigan avenue; defendant soon caught her and beat her mercilessly, knocking out her teeth, cutting her lips, and pulling her hair; he pulled her back to the sidewalk in front of the Bernice Hotel, continuing to beat her, and as she saw a taxicab stopping on the opposite side of the street she somehow managed to free herself from defendant, ran across the street and got in the taxicab; that she was hysterical and bleeding. The taxicab driver took her to the St. Luke's Hospital, where she was examined. It was found that her left lower jaw was broken, one front tooth had been knocked out and several others were loose. Her lip was cut, requiring five stitches and she was bleeding profusely. She was

unable to talk plainly but did answer questions as to her name, (which was understood to be Jean Vell,) address, and place of employment. Police were called and during the questioning obtained enough information to prepare a charge of assault and battery against defendant, on which he was arrested two days later. Dr. Charles Heilman, who examined her, testified there was no smell of liquor on her breath and that she had no symptoms of intoxication.

Defendant testified that they agreed to go to the Bernice Hotel together and denied that he attempted to rape her or even to molest her while they were in the taxicab, and that neither of them was very sober; that prosecutrix opened the taxicab door and stepped out before the car was completely stopped and fell down, striking her face on the curbstone; that he picked her up and the cab driver asked her if she was hurt and she replied that she was not; defendant said "Come on!" and she told him she was going home; that she walked across the street and got in a cab and he walked behind her and got in another cab and went home.

The taxicab driver who took them from The Green Front to the Bernice Hotel was not produced as a witness. Edward Flynn, the taxicab driver who took prosecutrix to the hospital, testified that as he was stopping across the street from the Bernice Hotel he saw a man and woman in front of it, and that the woman was running toward his taxicab; that the man was walking in the same direction but was apparently not chasing her. He did not see defendant strike prosecutrix. Flynn testified there were no other cabs around except his and the one right behind him. He testified prosecutrix was hysterical and was bleeding considerably. He carried her into the hospital and left after a few minutes.

The evidence was conflicting as to whether prosecutrix had made statements that she was going to make defendant pay for what he had done, and as to whether her attorney had told defendant he could make everything all right for a thousand dollars. Defendant contends his guilt was not

proved beyond a reasonable doubt. He points out that prosecutrix's testimony as to the alleged assault was uncorroborated and that she made no immediate complaint.

It is a correct principle of law that in prosecutions for assault with intent to rape, where the defendant denies the crime, the testimony of the prosecutrix should be corroborated by some other testimony, fact, or circumstance, (*Stevens v. People,* 158 Ill. 111,) but it is always to be borne in mind that it is the peculiar province of the jury to weigh and consider the evidence and judge, from the appearance and demeanor of the witnesses on the stand, their apparent honesty and candor, or the want of it, the weight that should be given to their testimony. If this were not so there would be little use for the jury system. (*People* v. *Hanisch,* 361 Ill. 465; *People* v. *Hohimer,* 271 id. 515.) Bearing both of these principles in mind, it is our opinion the jury was warranted in disbelieving defendant's testimony as to the cause of prosecutrix's injuries and in finding corroboration of prosecutrix's testimony in the circumstances. It is established that defendant was alone with prosecutrix in the rear seat of a taxicab late at night; that the taxicab was driven to the Bernice Hotel; that defendant had drunk a considerable quantity of liquor that night; that prosecutrix sustained a broken jaw and cuts and bruises while in the company of defendant, and that she was hysterical at the time she ran across the street to enter the taxicab driven by Flynn. We also feel the jury was warranted in considering the fact that defendant made no effort to see that prosecutrix received care for her injuries or even to see that she arrived home safely, as bearing on the credibility of his testimony as to how she received her injuries. The jury was justified in finding that prosecutrix received her injuries at the hands of defendant in an attempt to rape her, and not by falling against a curbstone.

In view of the character of her injuries and the circumstances, no significance should be attached to prose-

cutrix's failure to make immediate complaint. She was ordered by Dr. Heilman to lie quietly, she could not speak plainly, and, according to police officers present at the hospital, was unable to make a statement. This is a sufficient explanation of her failure to make immediate complaint of an attempted rape.

It is also argued that the specific intent to rape, which is the gist of the offense, was not proved. The argument is that, even accepting the testimony of prosecutrix as true, defendant was merely attempting to get her to go to, the hotel with him. This contention cannot be sustained. The specific intent to commit a rape must be proved, but the intention need not be an expressed one. The intent may be inferred from acts of the accused, the character, manner and circumstances of the assault, as well as from his words. (*People* v. *Guilfoyle,* 321 Ill. 93; *People* v. *Makovicki,* 316 id. 407.) There can be no doubt defendant's intention was to overcome all resistance in order to satisfy his lust.

Ogden Smith, attorney for the prosecutrix, testified to a conversation he had with Max Lurie, attorney for the defendant, relative to hospital bills. He testified Lurie told him defendant would pay those bills and said: "We feel we should do that anyway because Garafola is a dirty rat, anyway he has a record as long as your arm." An objection to this statement was sustained, the answer was stricken, and the court instructed the jury to disregard it. The court, however, denied defendant's motion to withdraw a juror and for a mistrial. It is argued this statement was so prejudicial that its effect could not be removed by striking it and instructing the jury to disregard it. It is true that "Human nature does not change merely because it is found in the jury box. The human mind is not a slate from which can be wiped out, at the will of another, ideas and thoughts written thereon." (*People* v. *Deal,* 357 Ill. 634.) The circumstances under which the testimony complained of was given are these: The defendant was a witness in

238

his own behalf and testified that Ogden Smith, who had been employed by Miss Bell, approached him and spoke of money. The People produced Smith in rebuttal. He testified that he never had a talk with defendant and had never mentioned money to him. Thereupon, and over the objection of the People, defendant's counsel asked Smith about a conversation he had with Max Lurie, who was representing the defendant. Smith replied that Lurie had approached him and discussed the question of doctors' and hospital bills. On re-direct examination, the People followed up this conversation and the witness Smith gave the substance of the entire conversation with Lurie, including the statement complained of. Under the circumstances, we cannot reverse the judgment in this case on account of this alleged error. The People made no effort to make proof of other distinct crimes. The evidence of such wanton and inhuman treatment of a woman in an effort to overcome her resistance is so convincing that justice would fail by an overthrow of the judgment. Accordingly, the judgment is affirmed.