**People of the State of Illinois, Plaintiff-Appellee, v. Michael Knowles, Defendant-Appellant.**

Gen. No. 52,880.

First District, Third Division.

October 1, 1970.

Arthur H. Grant, of Chicago, for defendant-appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, M. Scott Cisney, and Laurence J. Bolon, Assistant State's Attorneys, of counsel), for plaintiff-appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

Michael Knowles was found guilty of rape in a nonjury trial and sentenced to the penitentiary for a term of five to ten years. In this court he contends that the procedure leading to his identification was improper, that he was not proven guilty beyond a reasonable doubt and that his motion for a new trial or acquittal should not have been denied.

The prosecutrix testified that she was employed as a receptionist in an office in downtown Chicago. After leaving work at 5:00 p. m. on January 18, 1967, and shopping for an hour, she took a train and a State Street bus to her southside home. As she left the bus at 95th and Lafayette Streets about 7:00 p. m., she noticed two men conversing near the rear door. She surmised that one of them—whom she later identified as Knowles— followed her off the bus. She walked west on the south side of 95th Street toward her home which was approximately three blocks from the bus stop. The evening was dark and extremely cold.

As she neared a boarded-up tavern on the southwest corner of 95th and Perry, the attacker approached her from behind, put his hands over her eyes, and then slid them down over her mouth. He told her to drop her shopping bag and to turn around and follow him. She pulled one of his hands from her mouth and he

threatened to kill her. She screamed and he placed his hands back over her mouth. She fought with him as he dragged her behind the tavern to the alley off Perry Avenue.

He told her to lie down on the ground. He pushed her coat and dress up and ordered her to remove her underclothing. When she refused, he ripped those garments off. She refused to unzip his trousers and he used one hand for this purpose. She jerked his other hand from her mouth and screamed again. He again placed his hands over her mouth and said, "I am going to kill you for sure now." He started to choke her and then sexually attacked her.

The prosecutrix estimated that he lay on top of her for about twenty minutes. She described the alley as dark, but illuminated by a small light inside a converted garage that bordered the alley. She stated that she gained a clear view of her assailant's face. She particularly noticed that he had a gold crown on one of his front teeth, that he smelled strongly of cigarette smoke, and that he wore a black poplin, three-quarter length coat and a round hat with a narrow brim and flat top. Later in the trial, she described the crown on the rapist's center tooth as white gold.

After the attack, the assailant disappeared down the alley. She went back to 95th Street, picking up her purse on the way. She entered a nearby beauty salon, called her mother and the police. The police took her to a hospital where she was treated for abrasions on her face and legs. A vaginal smear test for the presence of sperm was positive.

On the following day she went to the police station, where she was shown approximately 700 photographs. She also viewed pictures on a movie screen. From these she picked the photograph of Michael Knowles as that of her assailant. She testified that she may have told a police officer that some of the other pictures resembled that of her assailant but that she only identified one. After she identified Knowles' picture, the police took her to his home, which was about a mile from the scene of the attack. Upon entering the house, she recog-

nized him as her attacker. He opened his mouth at her request and she recognized the crown on one of his teeth. When she repeated this identification in court, the assistant State's attorney indicated that the tooth in the upper left center of the defendant's mouth had a silvery plating covering its entire outer area.

Testifying on his own behalf, Knowles said that he left work on Wednesday, January 18, 1967, at 5:00 p. m. and met a friend, Alexander Webb, on a bus at 35th and State Streets. Knowles got off the bus at 93rd and State; he did not know where or when Webb got off. After attempting to visit another friend, Knowles returned home. He said that he had told his mother, with whom he lived, not to cook dinner that night because, since he was paid on Wednesday, he would send out for dinner. He arrived home after 6:00 p. m. and placed an order with a pizza parlor at 6:30 p. m. He and his mother then watched television. At 7:00 p. m. Webb dropped by to visit and left some fifteen or twenty minutes later. The dinners arrived around 7:30 p. m.; Knowles reported that he held a conversation with the delivery man concerning his difficulty in finding the Knowles' address. He also testified that he did not smoke and that he had never seen the prosecutrix until she came to his house.

The defendant's mother offered a description of the events of the evening of January 18th substantially similar to that of her son. She also said that he did not smoke.

Webb, the defendant's friend, testified that he had been to visit a doctor at 29th and Wells Street on January 18, 1967. He left the clinic about 5:00 p. m. and boarded a State Street bus. In his testimony he did not mention meeting Knowles during the bus ride. Webb left the bus at 93rd and State to go to a friend's house, to buy cigarettes, and to visit the Knowles' home at 91st and Harvard. He arrived there at 7:00 p. m. and saw that Knowles and his mother were watching television. After a short visit he left at 7:15.

Norman Lee, an employee of a restaurant, testified that on January 18, 1967, at 6:50 p. m. he had an order to deliver pizza to 9161 South Harvard, the Knowles' address. He left the restaurant at 7:00 p. m. and arrived

at the Knowles' home around 7:30 p. m. He recalled seeing the defendant on that occasion because, after Knowles paid him, they had a conversation regarding Lee's difficulty in locating the address. Adolph Gary of the Chicago Police Department testified that his check of the records of the restaurant showed that Lee left there with the Knowles' order about 7:00 p. m. Gary also said that when he went to the Knowles' home with the prosecutrix the day after the rape the defendant informed him that he was home at the time of the attack and had received an order of pizza about 7:30 p. m.

The defendant contends that the method used by the police to obtain his identification as the perpetrator of the crime violated his Sixth Amendment right to counsel and that, as a result, the in-court identification was so prejudicial as to deprive him of a fair trial.

■ United States v. Wade, 388 US 218 (1967) and Gilbert v. California, 388 US 263 (1967), hold that a pretrial, post-indictment confrontation for identification purposes is a critical stage of a prosecution at which the accused is entitled to the presence of counsel. In a companion case, Stovall v. Denno, 388 US 293 (1967), the court ruled that the Wade-Gilbert standards, which were pronounced on June 12, 1969, were to be applied prospectively. Since the prosecutrix' confrontation of Knowles took place in January 1967, the standard to be applied is whether, in light of all of the surrounding circumstances, the viewing of Knowles was so prejudicial as to deprive him of due process of law. People v. White, 116 Ill App2d 180, 253 NE2d 654 (1969).

■ ■ An in-court identification may be admissible, even when the pretrial identification is not proper, if it is shown by clear and convincing evidence that the courtroom identification had an independent origin arising from an earlier uninfluenced observation of the defendant. People v. Blumenshine, 42 Ill2d 508, 250 NE2d 152 (1969). Although it was dark and the alley but dimly lit, the prosecutrix was able to view Knowles at close range for twenty minutes. During this time his face was close to hers and he attempted to kiss her. She saw his features clearly, including the metal crown on his front tooth. Another factor to be considered is the lapse

of time between the alleged act and the contested identification; the prosecutrix identified Knowles the next day. Moreover, before she confronted him in his home she viewed several hundred photographs and some films, and had selected his picture from all those photos. Knowles' identification as her assailant had an origin independent of the contested identification procedure.

The defendant next contends that the complainant's identification was insufficient to sustain the conviction and that the alibi testimony raises a reasonable doubt of his guilt.

There can be no dispute as to the rape itself. The complainant's testimony of the occurrence was corroborated by her immediate telephone calls to her mother and the police, the report of the doctor who performed the vaginal examination, the bruises and scratches on her legs and face and by her torn underclothing which was introduced into evidence.

 Her testimony that the defendant was the perpetrator of the crime was clear, convincing and unshaken. The testimony of one witness, if it is positive and the witness credible, is sufficient to sustain a conviction even though that testimony is contradicted. People v. Cox, 22 Ill2d 534, 177 NE2d 211 (1961); People v. Washington, 121 Ill App2d 174, 257 NE2d 190 (1970). The adequacy of an identification raises a question of the credibility of the witnesses which is a matter for determination by the trier of fact, who has a superior opportunity not only to hear the testimony of the witnesses but to observe their demeanor on the stand. People v. Jackson, 28 Ill2d 566, 192 NE2d 873 (1963); People v. DeGrea, 107 Ill App2d 301, 247 NE2d 38 (1969). A reviewing court will not reverse on this ground unless the testimony is so unsatisfactory as to create a reasonable doubt of the defendant's guilt. People v. Brown, 86 Ill App2d 163, 229 NE2d 922 (1967).

 The trial court was not obliged to believe the alibi testimony presented by the defense over the positive identification by the prosecutrix, even though the alibi testimony was given by a greater number of witnesses. People v. Jackson, 95 Ill App2d 28, 237 NE2d

858 (1968). The trial court itself, at the conclusion of the trial, stated:

> "From all the testimony offered and based on the Court's observations of the witnesses, their demeanor and interest, I believe the complaining witness . . . told a truthful story of what happened. . . .
>
> ". . .
>
> "In the opinion of the Court, the alibi testimony of the defense lacked credibility."

Where the finding of guilt or innocence depends upon the credibility of conflicting testimony, the conclusion of the trial court will not be disturbed. People v. Baldare, 41 Ill App2d 67, 190 NE2d 179 (1963). The identification of the defendant was not so unsatisfactory as to leave a reasonable doubt of his guilt.

Finally, the defendant urges that his motion for a new trial or his motion for acquittal should have been granted. Illinois law provides that a judgment of acquittal may be entered and a defendant discharged when the evidence is insufficient to support a finding of guilty. Ill Rev Stats 1969, c 38, § 115–4(k). Since the State's evidence established the defendant's guilt beyond a reasonable doubt, the court was correct in not entering a judgment of acquittal. Furthermore, the defendant's motion for a new trial did not raise any grounds which would have justified the court's granting his motion for a new trial.

The defendant argued one or two minor points in his reply brief which were not advanced in his main brief. These will not be considered. Ill Rev Stats 1969, c 110A, par 341(g).

The judgment is affirmed.

Affirmed.

SCHWARTZ and McNAMARA, JJ., concur.