THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSEPH DOYLE GARRIOTT, Defendant-Appellant.

(No. 73-115; ▮▮▮▮▮▮▮▮)

Third District—June 21, 1974.

Michael J. Warner, of Rock Island, for appellant.

F. Stewart Merdian, Assistant State's Attorney, of Rock Island, for the People.

Mr. JUSTICE DIXON delivered the opinion of the court:

The defendant, Joseph Doyle Garriott, was indicted and tried for the crime of deviate sexual assault. After a jury verdict of guilty he was sentenced by the Circuit Court of Rock Island County for a term of not less than 10 nor more than 14 years. He appeals contending that he was not proven guilty beyond a reasonable doubt and that his sentence is excessive.

Carole Rosa, the complainant was a married woman, 24 years of age, who lived in the Rock Island area about 6 years. She lived with her husband and 21-month-old daughter. She has a Bachelor of Theology degree from the Bible Missionary Institute in Rock Island, was active in church as a teacher and considered herself a very religious person.

On Saturday, October 28, 1972, she left her daughter with her mother-in-law and drove her car to the Speedy Boy Car Wash, a self-service car wash in Milan, Illinois. No attendants were on duty. She first arrived at 12:30 but many cars were in line so she left and came back at 1 P.M. There are three stalls but only one was working. The stalls have aluminum doors with small glass windows. There is an opening between stall 2 and 3.

She testified that the defendant came into the car wash three times, and each time asked her where the manager was, each time she told him she didn't know; that she didn't work there. Each time he came in he would go outside the stalls and sit on a barrel. The door of the car wash was completely up. There was nothing to impede her view of the defendant. She looked at defendant from time to time as she washed her car. The fourth time the defendant came, she testified, was about 1:15 P.M. and he rushed at her with a pocket knife with a 4-inch handle and a 4-inch blade, held it to her throat, and told her not to scream, not to struggle, or he'd kill her. He told her he wanted her pants. He had his hand on her throat. She believes she screamed once. She testified he took her through the doorway from stall 2 to stall 3, backed her up against the wall next to stall 2, and told her to take off her underwear

and pulled her dress up. She had on a three-quarter length car coat, a dress, hose, girdle, pants, and shoes. She started to take her pants off, and he pulled them the rest of the way down. He did not take them completely off. They were at her feet. She was still standing up against the wall. He tried to kiss her, and told her to kiss him. He caressed her a little bit, but he never took her dress off or anything.

She testified that her only solace when something like that happens, is to turn to the Lord. She tried to talk to him about the Lord. She asked him if he were a Christian, and if he knew what it meant to be saved. He said, "Oh, yes, I'm a Christian," and then kept on as he was. Defendant pulled his pants and underwear down, pushed on her shoulder and pushed her down to a kneeling position. His penis was erect, and he pushed it in and out of her mouth for three or four minutes, telling her not to use her teeth. She gagged, and couldn't tell whether she was using her teeth or anything. He did not ejaculate. Then he pushed her down on her hands and knees, pulled up her dress in back, and forced his male organ into her rectum. This act took maybe 4 or 5 minutes. He did not ejaculate to her knowledge. He did not have normal sexual intercourse with her. He then pulled his pants back up and got ready to leave. She testified she was afraid at this time. He still had the knife, and as near as she could remember, it was still open.

He asked her if he could really be a Christian, and she said, "Yes," and he wanted her to tell him how, and she tried to tell him the basic steps. He asked her her name and where she went to church and told her he would be there in the morning. Then he left. He asked her what she was going to do when he left, and if she would call the police, and she said, "No." She did not see where he went. She got up, got her clothes back on, picked up her coat and the rest of the car mats and different things, put them in the car and got out as fast as she could.

She drove to her mother-in-law's house about 3 miles from the car wash. She noticed there was some blood from somewhere, and that she had a cut on the thumb of her right hand. She got blood on her dress and on her underwear as she tried to get dressed again. She threw the dress away about a week after the incident. The Police did not ask her to save it.

She didn't stop at the police station, because she told him she wouldn't, and she was scared, and didn't think. She didn't know what to do. She noticed she had an abrasion on the lower left side of her cheek, and on the rear part of her left shoulder.

On cross-examination, complainant testified that she didn't know that the Milan Police Station was located about three or four blocks from

the Speedy Boy Car Wash. As she was driving home, she went past the State Police Headquarters on Blackhawk road.

Willene Rosa, mother-in-law of Carole Rosa, testified that her daughter-in-law came home in her car shortly before 2 P.M. on October 28, 1972. She drove into the driveway and stopped close by the window. Willene Rosa noticed that after her daughter-in-law stopped her car, she sat in the car for awhile and arranged her hair and her face in the mirror, which is unusual for her, then got out of the car quickly and ran to the door. She could tell there was something wrong. There was blood down the front of her dress, which was not there before she left the house. She had a cut on her finger, which to the best of her knowledge she did not have when she left the house. Her hair was messed up, and she had a red spot on one side of her face. Willene Rosa called the police.

A. W. Rosa, Jr., husband of the complainant, testified that in the evening of October 28, 1972, he saw a mark on the left shoulder on the back of his wife, which looked like a heavy thumb print, and that there were two marks on her left cheek; that these marks weren't there a week before, which was the last time prior to October 28, 1972, that he had an opportunity to examine his wife's physical appearance.

That defendant, Joseph Doyle Garriott, testified that he has a 4th-grade education according to the tests he has taken. That he can read and write some. On October 28, 1972, he was employed by Flick's Plumbing Supply, which is located at Airport Corners, out by the Quad-City Airport, as a delivery driver. He was told to make a delivery of salt to the Speedy Boy Car Wash in Milan; that he arrived at the car wash between 10 and 15 minutes after 1 P.M. That there were six or seven motor vehicles in and around the area, but he did not see any people in and around the area of the car wash. Then he saw one of the stalls was open, No. 2. He walked over and there was a woman washing her car and sweeping out the front of the car and taking the mats out. He asked her where the manager was and when he would be back. She told him she didn't know where he was; that she didn't work there. The woman he saw is the complainant, Carole Rosa. He then walked over to the open-air market which is about 25 yards from the car wash, to see if they had a phone he could use to call his employer, but they didn't have a phone. Defendant testified that he then went back to his pick-up truck. It was about 1:20 or 1:25 P.M. He smoked about half a cigarette, threw it away because he wasn't feeling too good, and left, going back to Flick's. He was sick to his stomach, getting hot and cold chills. He asked his brother-in-law, David Navarro, who worked at Flick's also,

if he could borrow his car. He then punched out about 1:50 P.M. and went home. Defendant testified that he was wearing a blue levi jacket, a maroon sweat shirt, insulated underwear, brown bell-bottom pants, and a pair of work shoes. Carole Rosa had testified that defendant was wearing a dark brown or black jacket, waist length, light brown, bronze, or beige pants. On cross-examination, defendant testified that he has four or five knives, but never carries them at work.

Robert Roete, 18, a witness in behalf of plaintiff-appellee, testified on direct examination that defendant told him in the afternoon that he was ill and left work at approximately 2 P.M. Roete made the delivery of salt about 2:15 P.M. on October 28, 1972, at the Speedy Boy Cash Wash in Milan. On cross-examination, Roete testified that the pick-up truck is a white Ford, with a red rack, and has "Flick's" painted on the sides in big letters, easily seen a distance from the truck. In rebuttal, he testified the defendant carries a knife.

David Navarro testified that he loaned his car to defendant on October 28, 1972, about 1:30 P.M.; that defendant left work shortly thereafter. He also testified defendant was wearing a maroon jersey, which he had given him about a week before, and a blue denim jacket.

Shirley Tighe, sister of the defendant, testified that she saw the defendant at his home in the afternoon between 2 and 2:30 on October 28, 1972; that he was sitting in a chair, wrapped up in a blanket, had a temperature and had the chills.

Steven Doyle, a patrolman for the Police Department of the Village of Milan, was called by defendant and permitted to be examined as a hostile witness. He testified that the Speedy Boy Car Wash is located at the junction of 4th Street and Route 67 in Milan; that there is a pool hall across the roadway, and an open air market in and around the area of the car wash. He investigated the incident, and was told by the complainant, Carole Rosa, that the assailant was approximately 5' 9", 140 lbs., medium build, light blond hair, wore a dark brown waist length jacket, possibly denim, brown pants, with dark wide belt with square gold or silver buckle. Officer Doyle also testified that Bill Dryel who had been at the pool hall at approximately 12 noon, looked like the defendant, possibly with the difference of the hair, which is real light blond and longer, but that he did not investigate further the possibility that Bill Dryel did this or arrest him.

On October 31, 1972, Carole Rosa, her husband, A. W. Rosa, Jr., her father-in-law, A. W. Rosa, and her mother-in-law, Willene Rosa, went to Flick's Plumbing Supply Company, about 1:30 P.M. to identify a man that Mr. Flick said had made a delivery, on October 28, 1972, but he was not the defendant. At that time Carole Rosa saw the defendant

at Flick's. The Milan police had been called. When the defendant and Carole Rosa saw each other, the defendant started to leave the store, just as the policeman, Kenneth Wales, Assistant Chief of Police, of Milan, Illinois, was coming in the door. Chief Wales hollered at the defendant to halt, but he did not do so. He hastened toward his car, got in it, locked the doors, started it, backed it up and sped away. Chief Wales tried to stop him by firing one shot at his front tire, and two shots in the rear tire.

Defendant testified that the only reason he ran when he saw the police officer at Flick's on October 31, 1972, was because he thought he was wanted for parole violation by the State of California.

Defendant married his wife, Gloria, on November 6, 1971, and is living with her. He is 26 years of age.

Defendant has no prior felony convictions.

Defendant voluntarily turned himself in to the Rock Island County Jail when he called his wife and she told him he was wanted for rape or molesting a woman in Milan.

The defendant contends that he was not proven guilty beyond a reasonable doubt because:

1. He denied that he did it, and
2. The evidence is not clear beyond a reasonable doubt that
   (a) she did not consent, or
   (b) that she showed such resistance as will demonstrate that the act was against her will, or
   (c) that she gave immediate notification of the assault.

■■ With respect to the denial of the defendant that he committed the offense, this of course is no more indicative of innocence than a formal charge is indicative of guilt. The courts of this State have repeatedly held that the fact that a defendant denies guilt and that defense witnesses corroborate his alibi, does not, in and of itself create a reasonable doubt as to his guilt. (*People v. Jackson*, 95 Ill.App.2d 28.) A jury is under no obligation to believe the defendant's alibi evidence which is contradictory to positive evidence of the prosecutrix. (*People v. Newson*, 133 Ill.App.2d 391, *People v. Thomas*, 130 Ill.App.2d 1107, and *People v. Knowles*, 130 Ill.App.2d 78, *cert. denied*, 404 U.S. 965.) Further, in the instant case none of defendant's alibi witnesses established that he could not have committed the crime. Their testimony only indicated that he was home later in the afternoon, complaining of being ill.

■■ Defendant does not argue that there is failure of proof with regard to his identification, but assumes for the sake of argument that he committed the acts complained of, and contends that the proof with regard to consent is insufficient as a matter of law. This contention not only

ignores the evidence of struggle, the resulting marks and laceration, but also the law of this State that resistance is not even necessary where it would be futile and would result in the victim's life being endangered as here where the defendant was armed with a deadly weapon. *People v. Jackson,* 103 Ill.App.2d 209, *cert. denied,* 397 U.S. 957.

The presence of a deadly weapon has also been held to relieve the victim from the duty to cry out. (*People v. Gray,* 106 Ill.App.2d 110.) The fact that the victim herein sought solace in God is understandable in light of her religious background and family affiliations and the fact that she became reconciled to her plight as a result of being threatened with the knife did not destroy the validity of the charge.

■■ The mere lapse of time between the commission of the crime and the complaint and delay in the making of the complaint may be explained by testimony as to the surrounding circumstances as there is no set rule as to what constitutes inconsistent delay. (*People v. Mason,* 301 Ill. 370, 378.) Delay in making a complaint of the offense goes to the weight of the evidence and to the credibility of the prosecuting witness. It is a circumstance for the consideration of the jury. *People v. Garafola,* 369 Ill. 232.

Finally, the defendant's demeanor and reaction on being confronted with the victim at his place of employment and his immediate flight must be considered with the other evidence. *People v. Rossini,* 25 Ill.2d 617; *People v. Reed,* 103 Ill.App.2d 342.

■■■ From the evidence which has been related, it may be seen that the points of argument raised go more to the weight and credibility of evidence rather than its sufficiency, and to the question of whether we should accept the interpretation of the facts advanced by the defendant or the conclusion arrived at by the jury. We are unable to say that the evidence is so improbable or unsatisfactory as to require that the finding of the jury be disturbed.

■■ On March 20, 1973, the defendant stood convicted of the offense which was committed October 28, 1972. The defendant elected to be sentenced under the penalty provisions in effect at the time of the commission of the offense rather than under the Unified Code of Corrections. Section 11—3(b) of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, sec. 11—3(b)) then provided a sentencing range of from 4 to 14 years. He now asks that we apply the "spirit" of the new code and reduce his minimum sentence to 4 years. At the hearing on aggravation and mitigation evidence showed that defendant had a prior conviction as a juvenile offender. When a defendant contends that the punishment imposed by the trial court is excessive, although within the limits prescribed by the legislature, a court of review will not disturb the sentence unless it

clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose, or that the penalty is manifestly in excess of the proscription of the Illinois Constitution which requires that all penalties be proportioned to the nature of the offense. (*People v. Taylor*, 33 Ill.2d 417.) As the trial judge ordinarily has a superior opportunity in the course of a trial and a hearing in aggravation and mitigation to make a sound determination of punishment, an appellate tribunal should exercise its authority to reduce sentences with considerable caution and circumspection. (*People v. Hampton*, 44 Ill.2d 41.) Lack of a previous criminal record is one factor to be taken into account in considering reduction of sentences (*People v. Crews*, 42 Ill. 2d 60), as is also lack of injury to the victim of the crime. (*People v. Brown*, 132 Ill.App.2d 302.) Deviate sexual assault is a serious crime and severe penalties for its commission are appropriate. Under the facts of this case we find that defendant's sentence was not excessive.

For the foregoing reasons, the judgment of the Circuit Court of Rock Island County is affirmed.

Judgment affirmed.

STOUDER and ALLOY, JJ., concur.