The People of the State of Illinois, Plaintiff-Appellee, *v.* Steven Mitchell, Defendant-Appellant.

First District (2nd Division) No. 59749

Opinion filed December 23, 1975.

James J. Doherty, Public Defender, of Chicago (Terry Rubino and James N. Gramenos, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Raymond J. Prosser, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This was a prosecution in which a jury convicted Steven Mitchell of armed robbery. The trial court, after overruling post-trial motions and hearing evidence in aggravation and mitigation, sentenced him to a term of 20 to 60 years to be served consecutively with one of four to four years and a day he had received for a previous armed robbery conviction. He appeals to this court.

In his opening brief, defendant presented six issues, none that discussed the legal sufficiency of the evidence. Consequently, we ordered the parties to file supplemental briefs advising us of their views on this subject. This was done. Therefore, seven issues are before us for review.

1.  Whether the evidence on which the jury returned its verdict proved defendant guilty of armed robbery beyond a reasonable doubt.

2.  Whether the trial court erred in denying defendant's motion to suppress evidence which the state obtained as a result of his arrest without a warrant in his home.

3.  Whether it was plain error for the prosecution to present testimonial evidence which showed the jury that when he was advised of his constitutional rights at the time of his arrest, defendant refused to answer questions asked of him by policemen.

4.  Whether the trial court erred when, in permitting the State to impeach a written statement he gave the police, it admitted testimonial evidence that told the jury of defendant's prosecution for another offense.

5.  Whether the trial court erred when it admitted into evidence several cards that were found in defendant's wallet at the time of his arrest.

6. Whether the opening portion of the prosecution's closing argument to the jury was prejudicial.
7. Whether the trial court imposed an excessive sentence when it ordered defendant to serve a consecutive sentence of 20 to 60 years.

## I.

On Thursday morning, March 23, 1972, Joseph Eisenberg left home and went to his fur shop on the first floor of his three-story building at 8110 South Cottage Grove in the city of Chicago. In the rear of the building, Eisenberg had a detached garage in which he kept his 1969 Pontiac. Defendant Steven Mitchell and his family were Eisenberg's tenants and lived in an apartment on the second floor. At about 5 p.m. that afternoon, Eisenberg's wife, Frances, called him from the Marshall Field store in Chicago and asked him to meet her there at 6 o'clock so they could drive home. He agreed to do so. Eisenberg, however, did not keep the appointment; nor did he get home that evening.

The next morning, sometime between 8:30 and 9 a.m., Frances Eisenberg and her son-in-law, Paul Chervin, a Chicago lawyer, went to the fur shop looking for Eisenberg. The front door was locked. They went to the rear and looked into the garage through a window and saw that Eisenberg's automobile was not there. Chervin opened the garage door and thereupon, both of them saw Eisenberg's body on the floor, face down, under some boards. They called the police; and later examination disclosed he had been killed by a bullet wound in the back of the head. His face and forehead had marks which a pathologist said could have been caused by heavy blows with the butt of a gun.

At about 11 a.m., the same morning, John Muscarella was alone in his car approaching the intersection of Racine and Webster in the city of Chicago. As he proceeded, another car, heading west on Webster, ran into him. The driver was Steven Mitchell; and it was Eisenberg's 1969 Pontiac. In identifying himself to Muscarella, defendant said his name was "E. Mitchell" and that he lived at 4756 South Washtenaw, a statement that was untrue. Muscarella, in turn, gave defendant his name which defendant wrote on a card. They parted.

At about 1 p.m., the same afternoon, Chicago policeman Henry Crump and two fellow officers were assigned to investigate the death of Joseph Eisenberg. They saw defendant at 8110 South Cottage Grove and asked him if he knew anything concerning the circumstances of his landlord's death. Defendant said he knew nothing except earlier in the day his having overheard his brother and his sister tell their mother "* * *

that something was funny in [Eisenberg's garage] the previous evening." Crump talked with the two children; and as a result, the following day, he and his fellow officers took defendant, his brother and sister, to a police station where they were questioned. The younger children were shown photographs from a police mug book, and they gave the officers written statements. Thereafter, the three were released. No further inquiry was made of them by the police concerning Eisenberg's death. The next day, March 26, 1972, a Chicago policeman found Eisenberg's automobile parked one block away from his fur shop. When it was examined by crime laboratory technicians, it was discovered that the rear view mirror had a fingerprint that was identifiable and suitable for comparison.

On July 6, 1972, at about 3:30 a.m., Chicago policemen Michael O'Connor and Irving Kaplan went to apartment 303 at 5135 South Federal and knocked on the door. When defendant opened it, Officer O'Connor arrested him. He was searched; and on his person was found a wallet that contained six credit cards, an Illinois driver's license, a social security card and a blank check that belonged to Joseph Eisenberg. The card bearing Muscarella's name was among the items in the wallet. When O'Connor asked defendant what he was doing with credit cards and items of identification that obviously did not belong to him, he said that the owner of them was dead "* * * and he just had them." Defendant was taken to a police station. There another police officer made a victim check and learned that Eisenberg had been murdered. As a result, defendant was transferred to the central headquarters of the Chicago police department for questioning. In the course of that, another policeman asked defendant how he happened to have Eisenberg's personal belongings in his possession. He explained that he found the items in an alley behind his home a month before. Defendant was asked by the same officer if he had ever been in Eisenberg's 1969 Pontiac. He said he had not. He was asked a second time by another police officer if he had ever been in Eisenberg's vehicle. Again, he said he had not. Defendant's fingerprints were taken and when they were compared with the fingerprint that had been found on the rear view mirror of Eisenberg's Pontiac, they matched. A short time later, defendant agreed to give the investigating officers a written statement. This was arranged. An assistant State's Attorney was present. One officer asked the questions, another did the typing. Defendant was advised of his constitutional rights, but he waived them. When the statement was completed, it consisted of five typewritten pages.

And in the course of giving it, defendant told the officers that at about 11:30 on the morning of March 23, 1972, he saw his friend, Larry Lewis,

and invited him to his home; that later in the day, Lewis came with a man he knew only by the name "Jitters"; that sometime between 2:30 and 3 p.m., when Eisenberg came out of his fur shop to go to a mailbox, the two men asked who that was and he told them the man was his landlord; that Lewis and Jitters left the apartment, after which defendant fell asleep; that about 30 minutes later, they returned and he heard them arguing, Jitters asking Lewis "why he shot the man"; that Lewis showed him a five-shot .38-caliber pistol which defendant learned was used in shooting Eisenberg; that the two men gave him a wallet in which were Eisenberg's credit cards and identification items found in defendant's possession when he was arrested; that he did not tell this story to Officer Crump on March 24, 1972, who asked him about Eisenberg's death "[b]ecause at the time, I felt that I was too involved as it was, and decided to keep quiet"; that a short time after Lewis and Jitters gave him the wallet, the three of them went riding in Eisenberg's Pontiac, a ride that consumed six hours; that he drove, left Lewis and Jitters and then parked the dead man's car a few blocks from his fur shop. After he made the statement, defendant was charged and brought to trial.

## II.

The State called eight witnesses, stipulated to the testimony of three, offered and had received in evidence 15 individual and group exhibits consisting of photographs, documents and the five-page statement. Defendant did not testify. He called one witness, his young brother who, with his sister, had told their mother what they saw in and about Eisenberg's garage the evening before he was found dead.

When defendant's counsel made his opening statement to the jury, he admitted that the State's case against his client was going to be supported by "* * * very strong and persuasive evidence." In his final summation, counsel conceded that Eisenberg was murdered at the time he was robbed of his automobile and the personal belongings found on defendant when he was arrested. Speaking on defendant's behalf, the lawyer again agreed that the State's evidence was persuasive, proof which he said defendant had not contested. But he argued that none of it was direct; all of it was circumstantial and did not prove defendant guilty beyond a reasonable doubt. In the supplemental brief filed in this court, defendant pursues the argument that the evidence on which the jury convicted him was entirely circumstantial. He insists that errors committed by the trial court caused the jury to convict him.

The State has contended throughout defendant's prosecution that its evidence, although entirely circumstantial, points unerringly to his guilt. In its supplemental brief, it argues that this guilt was proved beyond a

reasonable doubt by defendant's possession of Eisenberg's automobile soon after the robbery; his possession of Eisenberg's personal property; his presence at the scene of the crimes; his conscious and deliberate attempt to prevent detection of his complicity by giving three different and inconsistent versions of how he acquired possession of the dead man's property, and even falsely accusing other persons of having committed the offenses. Thus, the State insists that the circumstantial evidence in the case proved defendant guilty beyond a reasonable doubt.

■■ It is well established that a defendant charged with armed robbery can be convicted on circumstantial evidence where it is of a strong and convincing character, such as to satisfy a jury of his guilt beyond a reasonable doubt. (*People v. Susanec,* 398 Ill. 507, 76 N.E.2d 33; compare *People v. De Mario,* 112 Ill.App.2d 175, 251 N.E.2d 267.) Where there is proof that a defendant had possession of stolen property or the proceeds of a robbery, the weight to be given that incriminating circumstance is a question of fact which a jury must decide when it considers all the evidence in the case. (See *People v. Deluce,* 237 Ill. 541, 546-47, 86 N.E. 1080.) Possession of a credit card belonging to the victim of a robbery, when considered with other evidence in the case, can be an important circumstance in determining the guilt of a defendant charged with robbery. (See *People v. Plodzien,* 104 Ill.App.2d 336, 244 N.E.2d 343.) Of course, possession of property taken in a robbery, standing alone, can not prove a defendant's criminal implication; it is however, an accompanying circumstance which would tend to show he committed the offense. Compare *People v. Nicholson,* 55 Ill.App.2d 361, 204 N.E.2d 482.

■■ In this case, the circumstantial evidence consisted of more than defendant's possession of Eisenberg's credit cards, automobile, driver's license, social security card, and blank check. There was proof that he was at the scene of the crimes; that he knew of Eisenberg's being shot and robbed yet denied this knowledge; and that on three occasions, he gave inconsistent stories concerning his possession of the dead man's personal property. In our judgment, the evidence, although entirely circumstantial, was overwhelming and proved defendant guilty of armed robbery beyond a reasonable doubt. *People v. Sanders,* 6 Ill.App.3d 820, 286 N.E.2d 785.

### III.

Prior to the trial, defendant filed a motion to suppress all evidence, direct and indirect, which the State obtained as a result of his arrest. When the motion was heard, he, his wife, and four policemen testified.

The officers told the trial judge that the arrest, without a warrant, was made because a man who knew him had complained that defendant knifed and robbed him in his room. When he was interviewed, the man gave the officers defendant's name, address and phone number. On this information, O'Connor and Kaplan went to defendant's home and arrested him. When he asked if they had a warrant, the officers said they did not need one because they were acting on the complaint of a citizen. They did not, however, tell defendant how long before the arrest they had been given the details concerning his identity.

Officer Dewey Ritenour was cross-examined concerning the man's complaint and asked if he knew the date of the alleged assault and robbery. Ritenour answered, "I believe the 2d or the 3rd of July, 1972." Under further questioning, Ritenour testified to interviewing the man 36 to 48 hours after the crimes he described and that he then named defendant as the offender, giving to the officers defendant's address and phone number. Officer O'Connor was also cross-examined about the same criminal incident; but he said that the attack occurred on "[t]he 4th of July." He was pressed concerning the matter, counsel asking him, "Now, Officer, you say that the armed robbery occurred on July the 4th. Are you sure it is not July 2nd?" O'Connor answered, "Well, to my knowledge, it was July 4th, Sir." This concluded the hearing of evidence. Thereafter, counsel argued that the motion to suppress should be sustained because defendant's arrest in his home was by officers who had known his name, address and phone number from July 2 to the 6th but did not use the available time to obtain a warrant; and that by this arrest, defendant was deprived of rights guaranteed by our State and Federal constitutions. The trial court, however, denied the motion.

Before us, defendant pursues the same argument. In responding, the State does not deny his claim that he was arrested in his home without a warrant. It contends, however, that the arrest was 36 to 48 hours after July 3, 1972, the later of the two dates Ritenour, in expressing his belief, said was the day the man in question was assaulted and robbed; and that the police entry into defendant's home, although in the early morning, was peaceful and supported by probable cause. Obviously, these competing arguments give rise to an important constitutional issue, one whose substance depends on the date assault and robbery occurred, and the length of time the arresting officers knew defendant's name, address and phone number before they arrested him without a warrant. The record before us discloses that defendant was charged with crimes for which he was arrested, and that he pled guilty to those charges. Defendant's prosecution for those crimes is a public record; and as such, we

will take judicial notice of its content. *People v. Dye*, 23 Ill.App.3d 453, 319 N.E.2d 102; *Nordine v. Illinois Power Co.*, 32 Ill.2d 421, 206 N.E.2d 709; Ill. Rev. Stat. 1971, ch. 116, par. 43.103.

Accordingly, we have examined the record of that prosecution and find that the alleged offenses were committed against a man named Huron Dukes, on July 4, 1972. On January 15, 1973, in answer to a motion made on defendant's behalf, the State's attorney filed a list of witnesses and a bill of particulars which stated that the offenses in question occurred on July 4, 1972, at or about 5:30 a.m. According to Officer Ritenour, Dukes was interviewed 36 to 48 hours after he was assaulted and robbed. This means that the officers who arrested defendant learned his name, address, and phone number sometime between 5:30 p.m. on July 5, and 3:30 a.m. on July 6 when they arrested him without a warrant in his home.

In *Jones v. United States* (1958), 357 U.S. 493, 2 L.Ed.2d 1514, 78 S.Ct. 1253, Mr. Justice Harlan, while discussing arguments that relate to the question with which we are here concerned, observed that "[t]hese contentions, if open to the Government here, would confront us with a grave constitutional question, namely, whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment." (357 U.S. 493, 499-500, 2 L.Ed.2d 1514, 1519. In *Gerstein v. Pugh* (1975), 420 U.S. 103, 43 L.Ed. 2d 54, 95 S.Ct. 854, Mr. Justice Powell said for the court that "[m]aximum protection of individual rights could be assured by requiring a magistrate's review of the factual justification prior to any arrest, but such a requirement would constitute an intolerable handicap for legitimate law enforcement. Thus, while the Court has expressed a preference for the use of arrest warrants when feasible, * * * it has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant." (420 U.S. 103, 113, 43 L.Ed.2d 54, 64-65.) A careful reading of the United States Supreme Court decisions discloses that the issue of warrantless arrest that has generated the most controversy, and which remains unsettled, is whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest. See *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 474-481, 510-512 n.1, 29 L.Ed.2d 564, 91 S.Ct. 2022 (White, J., dissenting); *Jones v. United States* (1958), 357 U.S. 493, 499-500, 2 L.Ed.2d 1514, 78 S.Ct. 1253.

■■ In this case, Dukes was knifed and robbed at about 5:30 a.m. on

358 Ill. 52, 192 N.E. 777; *People v. Lampson,* 129 Ill.App.2d 72, 262 N.E. 2d 601), and the error affected defendant's right to silence in the face of official interrogation (see *Griffin v. California* (1965), 380 U.S. 609, 14 L.Ed.2d 106, 85 S.Ct. 1229; *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602), we are satisfied, beyond a reasonable doubt, that in this case the error was harmless. See *Chapman v. California* (1967), 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824; *People v. Taylor,* 18 Ill.App.3d 367, 309 N.E.2d 642.

## V.

In closing its case in chief, the State offered, and the trial court admitted in evidence, the five-page statement defendant gave to the investigating officers. It was read to the jury by the assistant State's attorney who was present when defendant answered the questions. When this was completed, the prosecution announced it was going to call as its next witness assistant State's attorney Nicholas Pomaro who in 1967 prosecuted two murder cases in which defendant was the accused and Larry Lewis, the perpetrator named in defendant's five-page statement, was a State witness. Defendant's counsel objected and requested a hearing in chambers. In a colloquy between court and counsel, the trial judge was told that assistant State's attorney Pomaro was being called only to establish that in 1967 he prosecuted defendant for two murders and Larry Lewis was a witness for the prosecution. The lawyers representing the State told the trial judge it was their theory that defendant named Lewis as the perpetrator of the armed robbery and killing of Joseph Eisenberg because he wanted to get revenge for Lewis' testimony against him in 1967. They said that Lewis was available as a witness; but they preferred to call Pomaro because Lewis' testimony could contain prejudicial evidence concerning the 1967 prosecution. This would not be true of Pomaro's were he asked the few questions they proposed.

Defendant's counsel, however, persisted in his objections; but the court overruled them, and Pomaro was allowed to testify. He was asked questions which he answered, telling the jury that he was an assistant State's attorney who, in 1967, with another member of the staff, prosecuted defendant and that Larry Lewis was a witness against him. There was no cross-examination. The defense, however, moved for a mistrial; but the motion was denied. In their final arguments to the jury, the assistant State's attorneys argued that defendant's five-page statement naming Larry Lewis as the perpetrator of the murder and armed robbery of Joseph Eisenberg was for revenge because Lewis had testified against defendant in 1967. In this court, the State argues that Pomaro's testimony concerning the 1967 prosecution was properly admitted because it estab-

July 4, 1972. Thirty-six to forty-eight hours later, he was interviewed by Chicago policemen to whom he named his assailant, the defendant, and gave defendant's name, address and phone number. There is no evidence in this record which tells us that the officers could have obtained a warrant for defendant's arrest between 5:30 p.m. on July 5, 1972, and the time they arrested him at 3:30 a.m. on July 6. From the record before us, it is clear the officers had dependable information concerning two serious felonies, allegedly committed by defendant. Therefore, this was not the kind of case envisioned by Mr. Justice Harlan in his dictum from *Jones v. United States* (1958), 357 U.S. 493, 499-500, 2 L.Ed.2d 1514, 78 S.Ct. 1253. Rather, were we to agree with defendant that the officers who arrested him should first have obtained a warrant, "* * * such a requirement would constitute an intolerable handicap for legitimate law enforcement." (*Gerstein v. Pugh* (1975), 420 U.S. 103, 113, 43 L.Ed.2d 54, 65, 95 S.Ct. 854; compare *Dorman v. United States* (D.C. Cir. 1970), 435 F.2d 385.) Therefore, we conclude that the trial court did not err in denying defendant's motion to suppress evidence that was obtained by the State from his arrest. *People v. Bambulas*, 42 Ill.2d 419, 247 N.E.2d 873; see Ill. Rev. Stat. 1971, ch. 38, par. 107—2(c).

## IV.

During the presentation of its case in chief, the State called police investigators John McCabe and Michael O'Connor. McCabe testified concerning questions he asked defendant while they were driving from the central detention division of the police department to one of the area headquarters. He was asked, "Did he [defendant] make any further statements while he was in the police vehicle?" McCabe answered in the negative. O'Connor, who had arrested defendant, was questioned about what defendant said at the police station when he was confronted with the fact that he had Eisenberg's personal belongings in his possession. O'Connor was asked, "Do you recall what, in substance, he said at that time, Officer?" His reply was "He refused to make any comment at that time." No objection was made either to the questions asked McCabe and O'Connor or to the answers they gave. In this court, however, defendant argues that it was plain error for the trial court to permit testimony which showed the jury that after he was arrested and advised of his constitutional rights, he refused to answer questions asked of him by investigating officers.

■■ We do not agree. While it was error for the trial court to permit the prosecution to question its officer-witnesses and show the jury that defendant refused to answer questions after his arrest (*People v. Rothe,*

162

lished defendant's motive for naming Lewis in the statement, and proved he possessed a guilty mind concerning the armed robbery and killing of Joseph Eisenberg.

Defendant meets this argument with the contention that the trial court erred when, over objection, it allowed Pomaro to testify and tell the jury about the 1967 prosecution for other offenses, all for the purpose of impeaching the five-page statement which the State offered and had admitted in evidence as part of its case in chief. He points out that prior to trial, at his request, the court had ruled that because the murder prosecutions resulted in convictions for voluntary manslaughter, a noninfamous crime, the State could not prove them to impeach him if he were to testify.

■■ It is a general rule of our criminal law that evidence which would prove that the defendant committed another crime, one wholly independent of and unconnected with the crime for which he is on trial, is not admissible. (*People v. Spencer,* 7 Ill.App.3d 1017, 288 N.E.2d 612.) However, it is a corollary of this rule that evidence, relevant to the main issue, that tends to prove design, motive or knowledge, is admissible. (*People v. Tranowski,* 20 Ill.2d 11, 169 N.E.2d 347.) Such evidence is admissible even if it tends to establish the commission of an unrelated offense. (See *People v. Maldonado,* 3 Ill.App.3d 216, 278 N.E.2d 225.) The test of admissibility is whether the evidence fairly tends to prove the particular offense charged; therefore, any circumstance may be proved if it tends to make the proposition at issue either more or less probable. *People v. Rodgers,* 53 Ill.2d 207, 214-15, 290 N.E.2d 251.

■■ In this case, it was the State's theory that defendant's five-page statement was untrue; that it named Larry Lewis as the perpetrator of the crimes being investigated by the police as defendant's means of obtaining revenge for Lewis' testimony against him in 1967; that the false statement tended to show defendant's consciousness of guilt and was his way of obstructing police investigation of the armed robbery and murder of Joseph Eisenberg. The State wanted an evidentiary foundation from which it could make these arguments to the jury. The foundation evidence it offered was the testimony of assistant State's attorney Nicholas Pomaro. It was admissible. (Compare *People v. Wilson,* 8 Ill.App.3d 1075, 291 N.E.2d 270.) A defendant's false exculpatory statement has independent probative value as evidence of consciousness of guilt and is admissible. (*United States v. Lomprez* (7th Cir. 1972), 472 F.2d 860; *United States v. Kilpatrick* (7th Cir. 1972), 458 F.2d 864.) This is so even if it discloses that defendant committed another crime. (*People v. Houston,* 21 Ill.App.3d 209, 315 N.E.2d 192; compare *People v. Price,*

7 Ill.App.3d 110, 286 N.E.2d 530.) Therefore, we conclude that the trial court did not err when, over objection, it allowed testimony that told the jury of defendant's prosecution for another offense in order that the State could impeach the five-page written statement that he gave the police. Compare *People v. Simmons*, 407 Ill. 417, 95 N.E.2d 477; *People v. Smith*, 6 Ill.App.3d 259, 285 N.E.2d 460.

## VI.

After it completed its case in chief, the State offered and the court admitted in evidence 15 prosecution group and individual exhibits that included the wallet taken from defendant when he was arrested. Among the wallet's contents was a card on which defendant had written John Muscarella's name after the accident involving Eisenberg's Pontiac. With this card were two similar ones on which were printed some phrases that reflected adversely on the person possessing them. Defendant objected when these cards were offered in evidence and reasserted his objection when the State requested that the jurors have them during their deliberation. The objections were overruled. It is now argued that the trial court erred in these rulings because they allowed the jury to see materials from defendant's wallet which contained statements that reflected unfavorably on his character.

■■ We reject this argument. Defendant's wallet contained a card on which was Muscarella's name, a fact material to the issues before the jury because it connected defendant with possession of Eisenberg's automobile; the other cards were like that one and tended to prove defendant's possession of them all. Therefore, the other cards were relevant and material. Generally, evidence is admissible if it is relevant and material to an issue. (*People v. Herron*, 125 Ill.App.2d 18, 260 N.E.2d 428.) What exhibits in evidence a jury may take to its deliberation is a matter left to the sound discretion of the trial court; and exercise of this discretion will not be disturbed on appeal unless there is an abuse that prejudices the rights of an accused. (*People v. McGuire*, 35 Ill.2d 219, 220 N.E.2d 447; *People v. Allen*, 17 Ill.2d 55, 160 N.E.2d 818.) In our judgment, the trial court did not err when it admitted the cards into evidence nor when it permitted the jury to have them during its deliberation. *People v. Watkins*, 46 Ill.2d 273, 263 N.E.2d 115.

## VII.

After these rulings concerning the exhibits, defendant put on his defense; and thereafter, the State called one witness in rebuttal. Then, the parties argued to the jury. In this court, defendant complains that in the opening portion for the prosecution, the assistant State's attorney sug-

gested to the jury that when defendant was arrested, it was for a crime other than the ones for which he was on trial; that several references of this kind were made by the same assistant State's attorney who, in addition, infused the summation with his personal opinion concerning defendant's guilt; and that despite defendant's election not to testify, the attorney for the State branded him a liar. For these reasons, defendant insists that the opening portion of the State's final argument to the jury prejudiced his rights to a fair trial.

■■■ In determining whether a prosecuting attorney's argument to a jury is prejudicial, reference must be made to the context of the language used, its relation to the evidence, and the effect of the argument on the rights of the accused to a fair and impartial trial. (*People v. Smith*, 6 Ill. App.3d 259, 263, 285 N.E.2d 460.) Guided by these principles, we have examined the record and find no justification for the claim that the jury was told about some other offense for which defendant was arrested on July 6, 1972. Nor does it appear that the State's attorney gave the jury his personal opinion of defendant's guilt. It is true that although defendant did not testify, the assistant State's attorney called him a liar. However, it is always proper for a prosecutor to comment in final argument on facts appearing in the proof, or on legitimate inferences which can be deduced from the evidence. (See *People v. Powell*, 53 Ill.2d 465, 292 N.E.2d 409; *People v. Ashton*, 25 Ill.App.3d 172, 323 N.E.2d 133.) In this case, the record shows that concerning the circumstances under which he had possession of Eisenberg's personal property, defendant told three different stories to the investigating officers. We think it obvious that defendant lied when he spoke on the subject. Therefore, the characterization of him as a liar was a proper comment on the evidence. In any event, defendant's counsel in his final argument agreed with the assistant State's attorney that defendant had lied, not once, but on three occasions. A defendant in appealing his conviction cannot complain about a prosecutor's argument when his counsel in summation brings the prosecutor's statements to the jury's attention. (See *People v. Benson*, 132 Ill.App.2d 443, 270 N.E.2d 181; compare *People v. Stock*, 56 Ill.2d 461, 309 N.E.2d 19; *People v. Kelly*, 25 Ill.App.3d 753, 324 N.E.2d 82.) Therefore, we conclude that the opening portion of the prosecution's argument to the jury did not prejudice the defendant. *People v. Carr*, 114 Ill.App.2d 370, 252 N.E.2d 912; *People v. Forbis*, 109 Ill.App.2d 220, 248 N.E.2d 298.

## VIII.

We turn to the remaining issue, one that requires us to determine whether the sentence which the trial court imposed on defendant is excessive. Resolution of this issue requires examination of the record after defendant was convicted.

This discloses that after the jury returned the verdict that found defendant guilty of armed robbery, the trial court continued the cause for the filing of post-trial motions and a presentence report. This was done; and the presentence report was before the trial judge at the sentence hearing and was incorporated into the record with defendant's consent. From it, the trial judge learned that defendant was born in Chicago on December 12, 1950. Thus, as defendant stood before the court, he was 22 years of age. The facts which the State had proved to the satisfaction of a jury told the trial judge that defendant robbed his landlord under circumstances in which the man's automobile and personal belongings were taken from him and he was killed by a bullet wound in the back of the head, his head and face smashed by blows from a gun butt. Then, in further aggravation of the offense, the judge was told that in 1967, when defendant was 16 years old, he was charged with two armed robberies and two murders. In a bench trial, defendant was convicted of voluntary manslaughter in one case; and he pled guilty to voluntary manslaughter in the other. He was committed to the Youth Commission for a term of five to twelve years in the case in which he was convicted, and two to five years in the case in which he pled guilty. In *People v. Mitchell*, 116 Ill.App.2d 343, 252 N.E.2d 775 (abstract opinion), we affirmed his convictions.

The record does not give us the details; but in any event, on March 23, 1972, defendant was at liberty in Chicago. According to the jury's verdict, on that day he robbed Joseph Eisenberg while armed. This fact was not discovered by the authorities; so he remained at liberty until July 4, 1972, when Huron Dukes complained to Chicago policemen that defendant had attempted to murder him and had robbed him in his home. A month before the sentence hearing, defendant pled guilty to charges that he had robbed Dukes while armed and had attempted to murder him. Therefore, the trial judge had before him a 22-year-old defendant who had already been given a five to twelve year sentence, and who had a criminal record consisting of indictments for three murders, four armed robberies, and two aggravated batteries. He had been convicted of two voluntary manslaughters, two armed robberies and an attempt to murder. In all the cases in which defendant was charged, there was evidence of serious and fatal injuries to the victims of the crimes.

■■ A defendant's criminal record and the injury, if any, to the victims of the crimes with which he is charged are factors to be considered in determining whether the sentence imposed on him is excessive. (Compare *People v. Brown*, 132 Ill.App.2d 302, 270 N.E.2d 501; *People v. Garriott*, 20 Ill.App.3d 994, 313 N.E.2d 189.) In this case, these factors justified, if not mandated, the sentence imposed. In our judgment, the

20- to 60-year sentence, consecutive with the previously imposed sentence for armed robbery, was not excessive.

## IX.

We have resolved each issue which defendant has presented to us in his brief. In addition, because we were concerned about the relation of these issues to the sufficiency of the evidence, we ordered the filing of supplemental briefs. We have concluded that defendant was proven guilty of armed robbery beyond a reasonable doubt, and that no reversible error occurred in the prosecution that resulted in his conviction. The judgment is affirmed.

Affirmed.

DOWNING, P. J., and STAMOS, J., concur.